# BIRMINGHAM TRUST & SAVINGS CO. v. ATLANTA, B. & A. RY. CO.

### (District Court, N. D. Georgia. March 26, 1921.)

### No. 156.

1. **Receivers ⊚⇒31—Friendly proceedings held not collusive or fraudulent.**

   Where the creditor asking for the appointment of a receiver had a valid debt, though it was not yet due nor reduced to judgment, and it appeared that the proceedings were suggested by the president of the defendant railway company, and that the defendant admitted the allegations in the bill and joined in the prayer for relief, the friendly nature of the proceedings does not render it collusive or fraudulent, especially when there is no one seeking a revocation of the receivership, and the parties objecting to the court's orders to the receiver would probably have no standing to seek revocation.

2. **Railroads ⊚⇒207—Cannot be compelled to operate at loss.**

   Since railroad property, though devoted to public use, cannot be taken without due process of law, nor without compensation, so that the railroad cannot be compelled to operate at a continuous loss, or even without a reasonable return on the investment, a court appointing a receiver for the railroad for the primary object of preserving the property until the rights of all concerned in it can be ascertained and effectuated, cannot require the railroad to be operated at a continuous loss.

3. **Railroads ⊚⇒207—Receiver should not operate, when consuming the corpus.**

   When it appears that the operation of a railway by a receiver under existing conditions is consuming the corpus of the property, and there is

---

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

no prospect of an early change for the better, it is the duty of the court to change the conditions by reducing operating expenses, since it cannot raise rates nor compel patronage, or, as a last resort, to cease operations.

**4. Receivers ☞90—Not bound by executory contracts until accepted.**

While a receiver takes the property subject to all existing liens on it, he is not bound by the executory contracts of the owner, but may, under the authority of the court, adopt them, if it appears to the benefit of his trust, or decline to adopt them and leave the original contracting parties to their legal remedies.

**5. Receivers ☞90—Continuing performance of contract for reasonable time not an adoption.**

A receiver has a reasonable time after his appointment within which to elect whether to adopt executory contracts, and the mere continuance of the execution of a contract pending election within such time is not an adoption of it.

**6. Receivers ☞90—Held not bound by corporation's contracts with employees.**

A contract with railway employees stands on the same footing as other contracts in receivership proceedings, and where the order authorizing the receiver to operate the railway expressly provided that no contracts of the company were to be considered adopted by him without authority from the court, and within three days of his appointment the receiver applied to the court for an order reducing the wages of the employees, there can be no contention that he had adopted the existing wage contracts of the railway.

**7. Receivers ☞113—Administrative order may be granted, with leave to apply for subsequent hearing.**

In receivership proceedings, an administrative order, which affects numerous persons not parties to the cause, may properly be granted on the receiver's application, with leave to parties affected thereby to bring on a hearing thereafter, since such order is the most practical way of getting the hearing, and adjudicates nothing, but merely permits the receiver to act thereon at his own risk of the result of the subsequent hearing.

**8. Receivers ☞96—Labor Board has jurisdiction over wages of receiver's employees; "carrier."**

Though the Transportation Act, in the portion establishing the Labor Board, does not expressly mention receivers, its definition of carriers dealt with as including any carrier by railroad subject to the Interstate Commerce Act, with certain exceptions, is sufficiently broad to cover a receiver operating an interstate railroad.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Carrier.]

**9. Receivers ☞96—Court has jurisdiction to determine whether receiver can pay current wages.**

Where there is no dispute as to the reasonableness of the existing wage scale of railway employees, but the receiver claimed the operating revenues were insufficient to pay such scale, the question of whether the wages should continue to be paid or not was one for the final determination of the court appointing a receiver, as was also the question whether the wages fixed by the Labor Board deprived the railway of its property without compensation, so that the court can determine those questions on an application by the receiver for a reduction of wages, even though the Labor Board might also have jurisdiction to determine them subject to review by the courts.

**10. Receivers ☞96—Newlands Act, delaying wage reduction, applies to railroad receivers.**

Under Newlands Act, § 1 (Comp. St. § 8666), defining carriers and employees affected thereby, and section 9 (section 8674), providing that, whenever receivers are in control of the business of employers covered by the act, the employees of such employers had a right to be heard

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

before wages were reduced, after at least 20 days' notice of the proposed hearing, clearly includes all persons operating railroad trains at the time the receiver takes possession, so that the reduction of the wages of such persons under the act can only be made after 20 days' notice.

**11. Receivers ⊜96—First order fixing wages is subject to Newlands Act.**

Since the receiver ordinarily continues the business of a railroad without interruption, and tentatively, at least, continues the employees of the owner as his employees, the contention that the first order of the receiver establishing wages of employees was not within the intent of Congress in adopting Newlands Act, § 9 (Comp. St. § 8674), forbidding reduction of wages without 20 days' notice, cannot be sustained.

**12. Receivers ⊜96—Newlands Act, requiring hearing before wage reduction, is valid regulation.**

The provision of Newlands Act, § 9 (Comp. St. § 8674), requiring a hearing after 20 days' notice before the reduction of wages by a railway receiver appointed by the federal courts, is justified as a statute of procedure in federal courts, under the implied power of Congress to regulate the exercise of the jurisdiction of the courts which it is authorized by the Constitution to establish.

**13. Commerce ⊜58—Statute temporarily fixing wages to avoid strike is valid regulation.**

A law fixing the wages of certain classes of railway employees temporarily pending a hearing, for the purpose of avoiding a strike, is a valid regulation of commerce.

**14. Constitutional law ⊜89(1)—Receivers have no guaranteed liberty of contract.**

A receiver, as such, has no general liberty of contract, so that a statute prohibiting him from reducing wages of his employees pending a hearing is not objectionable, as violating his liberty of contract, even if it were construed to prevent him from discharging employees to hire others at lower wages.

**15. Receivers ⊜96—Can make wage reductions by contract without prior hearings.**

The reduction of wages by a railway receiver appointed by the federal court, forbidden by Newlands Act, § 9 (Comp. St. § 8674), without a hearing after 20 days' notice, is a reduction not consented to, since only such reductions provoke strikes, which it was the object of the act to prevent, and therefore that statute deos not prevent the receiver from making contracts with the existing employees or with new employees for employment at reduced wages.

**16. Constitutional law ⊜298(2)—Eminent domain ⊜2(8)—Suit requiring maintenance of existing wages for 20 days not a deprivation of property without just compensation or due process of law.**

Newlands Act, § 9 (Comp. St. § 8674), forbidding wage reductions by federal receivers of interstate railways until after a hearing on 20 days' notice, is not unconstitutional, as taking property without due process of law or without just compensation, since it merely requires maintenance for a brief period, of the wage scale consented to by the owner of the property and if such maintenance is impossible the operation can be stopped.

**17. Receivers ⊜96—Only employees actually operating trains are within Newlands Act.**

Under Newlands Act, § 9 (Comp. St. § 8674), requiring a hearing on 20 days' notice before reduction of wages of employees of a receiver of a railway appointed by a federal court, and section 1 (section 8666), defining employees affected by the act as persons actually engaged in train operation or train service, train operatives and train service men include only engineers, firemen, conductors, switchmen, train hands, and porters,

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and these alone are covered by the act, though telegraphers, station agents, clerks, and track and shop men are necessary to the continued operation of trains.

**18. Receivers ⚮114—Employees held entitled to attack court order reducing wages.**

> Employees of a railway when a receiver took it, who continued in such employment under protest after the receiver reduced the wages under an order of court invalid under Newlands Act, § 9 (Comp. St. § 8674), because not rendered after a hearing of which 20 days' notice had been given, were entitled to claim the compensation previously paid them for the time they so served under protest, and therefore have a standing in court to attack the validity of the order reducing the wages, though thereafter they terminated their employment by striking.

In Equity. Suit by the Birmingham Trust & Savings Company against the Atlanta, Birmingham & Atlantic Railway Company, in which a receiver was appointed for the defendant. On motion by N. H. Evans and others, as employees of the receiver and as representatives of the other employees, to rescind an order previously entered reducing the wages of the employees. Order reducing wages modified, by excepting therefrom train employees.

See, also, 271 Fed. 743.

Reuben R. Arnold, of Atlanta, Ga., for complainant.
Brandon & Hynds, of Atlanta, Ga., for defendant.
Branch & Howard, of Atlanta, Ga., for employees.

SIBLEY, District Judge. A creditor, holding a debt not due, but secured by bonds having past-due coupons, filed a bill in behalf of itself and other creditors against the Atlanta, Birmingham & Atlantic Railway Company, alleging insolvency and continued inability to earn operating expenses, whereby statutory liens for materials and labor were being accumulated in large amounts having preference over the mortgages securing the bonds, and whereby numerous suits were about to be filed and the property likely to be dismembered by the foreclosure of mortgages on its various parts, and praying for the appointment of a receiver.

The company answered, admitting the facts, and joined in the prayer for a receiver, and one was appointed on February 25, 1921, and directed to carry on the business of the defendant company "in the same manner as at present," until the further order of the court, it being expressly provided that "contracts by the railway company shall not be considered as adopted by the receiver unless he is expressly authorized by the court to adopt them."

On February 28, 1921, the receiver reported that since December 31, 1918, and especially since the establishment of a wage scale, July 26, 1920, under Labor Board Decision No. 2, at a much higher rate of pay than had ever before prevailed, the company had been unable each month to earn operating expenses, and that the deficit, exclusive of interest on bonds and other indebtedness, was about $1,000,000 per year, and increasing; that while there was money available to pay the current pay roll he had no means of procuring money for paying other operat-

ing expenses then due of more than $300,000, and he would not be able to meet another similar pay roll; that all possible economies otherwise had been practiced and that the wages of unskilled labor should be made such as were made necessary by conditions prevailing in the various communities in which it was employed; and that all other wages and salaries should be put on a basis of those in effect December 31, 1917, plus one-half of the increases since that date, the same to be effective March 1, 1921. An order so authorizing was granted, providing:

"That any employee or employees will be permitted to be heard at any time hereafter on the question of wages and salaries paid by the receiver or on the terms of this order, on proper application to the court and notice to all parties concerned."

The receiver, on March 3d, reported that he had posted the notice of the new wage scale and in a conference with the representatives of the employees they had informed him that they continued to work only under protest. The receiver repeated the statements of his former report and made the contention that the payment of greater wages than were earned by the company would be to take the property without due process of law, and deprive the creditors of the company of the equal protection of the laws and take their property for a public use without adequate compensation being paid. The court thereupon passed an order as follows:

"Upon considering the foregoing petition, it is ordered that the question of wages and salaries be, and the same is, set for a hearing on the 26th day of March, 1921, at 10 o'clock a. m., at the federal courtroom at Atlanta, Ga., and all employees or any of them who wish to be heard, will be given a hearing at that time as to what wages and salaries the receiver shall pay from that date and until the further order of the court.

"It is further ordered that a copy of the foregoing petition and this order, or the substance thereof, be posted by the receiver upon all customary bulletin boards, in or upon the railway of the Atlanta, Birmingham & Atlantic Railway Company."

On March 5th the receiver reported that the employees had that day announced to him, through their representatives, that they would retire from the service on that day, and some had done so, and asked instructions as to the scope of the hearing set for March 26th, and his relations to the United States Labor Board. The following order was then passed:

"Upon the petition for instructions of the receiver this day filed, the following response is made: The order of February 28, 1921, authorizing a reduced scale of wages and salaries, follows a practice common in administrative orders which may affect numerous persons who are not parties to the case, whereby the order is passed with the right of any one affected to review it. An order so passed does not adjudicate, or even prejudice, the rights of any one who seasonably and orderly presents them to the court. The order in question does not cut off a hearing, but facilitates it for all who desire to be heard. The order of March 3, 1921, fixing a hearing on the question of wages and salaries for March 26th, was passed on the court's attention being called to section 9 of the Act of Congress of July 15, 1913, to comply with the procedure therein pointed out as to all employees affected by the section. At the hearing the order of February 28th will be given no other or further effect, as to any employee than it ought to have by law under the facts that may then be established.

"No question touching the action or jurisdiction of the Labor Board has been raised in or passed on by this court. The departments of the government will act in harmony to carry out, the functions assigned them by law. If the powers of the Labor Board are invoked, their jurisdiction of the present aspect of this controversy will naturally be in the first instance for their determination. Whether any conclusion reached by them can or should be enforced by this court will then be for decision here. No more specific instructions are deemed necessary at this time.

"It is hoped that the employees will not, by refusing to operate the road, further jeopardize their own interests and complicate their rights by terminating their status as employees, or that they will make more uncertain and difficult the duty of the court in ascertaining the law and the facts by refusing to participate in said hearing. Should the employees cease to work, the receiver is directed to take all necessary steps to protect the property in his hands and to avoid incurring liability to shippers and others until the further order of this court.

"Let a copy of this order be posted on each bulletin board of said railway company as provided in the order of March 3, 1921."

On March 9th, complainant amended its bill, setting up that section 9 of the Newlands Act (Comp. St. § 8674), hereinafter discussed, was unconstitutional and void as applied to this case, because limiting the receiver's liberty of contract, denying him the equal protection of the laws, and taking the property in his hands without due process of law, to the injury of complainant and the other creditors, and that to continue for even 20 days the present scale of wages would be taking the property of said creditors without due process of law and without just compensation, in violation of the Fifth Amendment of the Constitution.

On March 14, 1921, N. H. Evans, W. M. Martin, and others, alleging themselves to have been employees of the Atlanta, Birmingham & Atlantic Railway Company at the time of the receivership, and to be representatives of the several classes of employees and committeemen of their several brotherhoods and authorized to represent them, petitioned the court for a rescission of the order of February 28th, and a restoration of the then status, on the grounds, generally stated, that the order was improvidently granted without a hearing, and that under the Transportation Act (Act Feb. 28, 1920, c. 91, 41 Stat. 456) the authority to reduce railroad wages was now exclusively in the Labor Board, and that the order violated the provisions of section 9 of the Newlands Act, requiring a hearing after 20 days' notice to precede a reduction of wages. This petition was answered by the receiver and the original complainant and defendant, wherein, among other things, the unconstitutionality of section 9 of the Newlands Act as applied to this case was insisted upon.

On the hearing the petitioners for rescission stated that they made no dispute at this time of the facts reported by the receiver, which were the basis of the order, but rested on their points of law. Evidence was submitted, showing that the telegraphers were necessary to move trains other than scheduled trains, that freight could not be handled without station agents and clerks, and that track hands and mechanics were necessary to keep the track and equipment in such repair as that trains could run, and that practically all employees were necessary to the continued operation of trains. The receiver produced evidence as to the

condition of the road's business supporting his report; showed that the court's orders had been duly posted on the bulletin boards; that persons only who were employed on trains were regarded in the railroad business as being in train service or as train operatives, the expressions being confined to engineers, firemen, conductors, switchmen, flagmen, and porters; that all members of the classes of petitioning employees had, on and after March 5th, refused when called to go on duty, and had been "bulletined," meaning their positions had been recognized as **vacant thereafter**; that train operations had ceased entirely for a week, but that a number of other employees had since been secured on the new schedule of wages, who were contented with the employment and desired to remain as permanent employees. Much evidence was also introduced touching the effort of the railroad to make a similar reduction in wages, beginning in a notice issued December 29, 1920, and culminating in a proceeding before the Labor Board, which on February 15, 1921, decided, at the instance of the employees, as was testified, after reciting that a conference between employers and employees had related only to the contention that the employer was financially unable to pay the wages, that:

"In view of the fact that the record clearly shows that no conference has been had between the parties with reference to the justness or reasonableness of the wages fixed by Decision No. 2 of this board, the board does not deem it necessary to decide to what extent, if at all, a carrier's financial condition is a factor in the determination of just and reasonable wages to be paid by such carrier.

"In the judgment of this board the conferences heretofore held do not constitute a compliance with section 301 of the Transportation Act, for the reason that no conference has been had between the parties with reference to the justness and reasonableness of the present wages.

"It is the decision of this board that it is without jurisdiction to determine the present dispute until section 301 has been complied with by conference of the parties, the subject-matter of which conference shall be whether the present wages are just and reasonable."

It was further testified that, although the employees were conferring among themselves with the purpose of holding further conferences with their employer, the employer did not know of this, and in fact no further conferences had been held at the time of the receivership. It also appeared that the move for a receivership had been suggested by the then president of the railway company to the moving creditor.

Treating the reports of the receiver as true for the purposes of this hearing, the following opinion is expressed upon the points agitated:

[1] 1. While it appears from the evidence that the receivership was sought by the railway company, and from the record that the creditor's principal debt was not due, and that the allegations of its petition were admitted and its prayer for a receivership joined in by the defendant company, the proceeding was not collusive. The debt was a real and valid debt, and its not being due nor reduced to judgment did not necessarily defeat the relief. The allegations as to the condition of the company were true and must have been admitted by a truthful answer. The friendliness of the proceeding did not render it fraudulent. Metropolitan Railway Receivership, 208 U. S. 91, 28 Sup. Ct. 219, 52 L.

Ed. 403. Besides, no revocation of the receivership is sought here, and it is not thought the petitioners would have any standing to revoke it.

[2] 2. The primary object of a receivership is to preserve the property, which is taken into custody of the court, until the rights of all concerned in it can be ascertained and effectuated. In the case of a railroad, such preservation usually implies that it be kept operating, and the duty of service to the public renders such operation ordinarily imperative. But a railroad, though devoted to a public use and affected with a public interest, and hence subject to public regulation and control, remains private property and protected by the constitutional guaranties made to such property, that it shall not be taken from its owner without due process of law, nor be taken for public purposes without just compensation. A devotion to public use does not mean devotion to public consumption or destruction. By no sort of regulation can a railroad be compelled to operate at a continuous loss (Brooks-Scanlon Co. v. Commission, 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323), or even without a reasonable return on the investment (Northern Pacific Ry. Co. v. State of North Dakota ex rel. McCue, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Norfolk & W. R. R. Co. v. Conley, 236 U. S. 605, 35 Sup. Ct. 437, 59 L. Ed. 745). If the owners cannot be required to consume it in operation, a fortiori the power of the court invoked for its preservation ought not to be used for its unconstitutional destruction.

[3-5] 3. It follows that when it appears that operation under existing conditions is consuming the corpus of the property, and the condition is not merely temporary and that there is no prospect of an early change, the duty of the court is imperative either to change the conditions for the better or to cease operations, the latter to be a last resort. Since the court cannot practically raise rates nor compel patronage, it is usually shut up to reducing operations and expenses. It has been long and well settled that a receiver, while he takes the property subject to all existing liens on it, is not bound by the executory contracts of the owner. He may, under authority of the court, adopt them where it appears to the benefit of his trust to do so, or he may decline to adopt them and leave the original contracting parties to their legal remedies. And he has a reasonable time to make his election, and the mere continuance of the execution of a contract pending election is not an adoption of it. 34 Cyc. 258, 259; U. S. Trust Co. v. Wabash R. R., 150 U. S. 287, 299, 14 Sup. Ct. 86, 37 L. Ed. 1085.

[6] The principles thus stated apply to contracts with railroad employees. The existence in this case of some sort of contracts between the railway company and the Labor Unions is referred to in the pleadings, but the contracts are not themselves exhibited nor put in evidence. Since the order of the court authorizing the receiver to operate the railroad expressly provided that no contracts of the company were to be considered adopted by him without authority from the court, and since the receiver's action on the matter of wages was taken within three days of his appointment, there can be no contention here that these contracts, whatever they were, had been adopted. Being unhinder-

ed by contracts, the receiver made a showing, the accuracy of which has not yet been contested, which indicated that only by reducing his wage scale could he escape suspension of operation. Thereupon he was authorized to establish a reduced scale of wages and salaries, whereby all persons of all ranks should receive compensation on a basis of their pay December 31, 1917, plus one-half of increases since made, with the right to any and all employees to be heard on application.

[7] Where an administrative order may affect numerous persons not parties to the cause, it is a common practice to grant such order as appears to be proper, with leave to bring on a hearing thereafter. Such an order does not deny a hearing, but invites it, and is the most practical way under such circumstances of getting it promptly. It adjudicates nothing, and the receiver and all others who act under it before a hearing do so at their own risk as to the result of the hearing. Union Trust Co. v. Ill. Midland R. R., 117 U. S. 435, 436, 6 Sup. Ct. 809, 29 L. Ed. 963. The order here in question was therefore, aside from special statutes, regular in its form. Impropriety in its matter is, as has been said, not contested; no contradiction of the facts on which it was based being made, and no other provisions as to the wages to be fixed being yet suggested.

[8] 4. Passing, then, to the questions of law made, has the United States Labor Board exclusive jurisdiction? Receivers are not expressly mentioned in the portion of the Transportation Act establishing the Labor Board, but its definition of the carriers dealt with as including "any carrier by railroad, subject to the Interstate Commerce Act, except a street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation" (41 Stat. 469), is sufficiently broad to cover a receiver operating an interstate railroad. See United States v. Nixon, 235 U. S. 231, 35 Sup. Ct. 49, 59 L. Ed. 207. Many questions touching terms and conditions of railroad employment, in view of the superior information and wider experience of the Labor Board on such questions, might be better handled by it than by the court, and no objection is seen to a receiver submitting such to the board, with the approval of the court.

[9] But where, as is the case here, there is no dispute as to conditions of employment, nor as to the just and reasonable wage normally to be paid, but only a question as to the ability of the receiver to pay the wage that has been established, without violating the Constitution, it is not seen how a decision of the Labor Board would be helpful. Not only are the purse strings of the receivership in the hands of the court, but the interpretation and application of the Constitution is the function of the court as against all boards and commissions, and the court cannot abdicate that function. Its decision upon the question indicated is the only ultimately effectual decision, and to seek that of another tribunal would be barren of practical result. Questions between a receiver and his employees do not ordinarily involve matters of normal railroad operation or abstract desirability, but are always complicated by the peculiar condition of the business in his hands and are limited to short periods of readjustment. Frequently the expense and delay of seeking an ad-

visory decision from a Labor Board would be disastrous in the exigencies of the receivership.

Moreover, in this case the Labor Board has apparently held itself without jurisdiction of the subject-matter. After reciting conferences between the railway company and its employees, in which the contention was, as it still continues to be, financial inability to pay the wage, the board held that, until another conference should be had or refused on the question whether the wage was "just and reasonable," it was without jurisdiction. No such conference has been held or refused, and no such issue has been made, and according to the board's ruling its want of jurisdiction continues. It is not necessary, however, to express an opinion upon the jurisdiction of the Labor Board. It cannot be doubted that the ultimate decision of the question agitated here must be, and its initial decision may be, made by the court controlling the receivership.

[10] 5. Does the order violate section 9 of the Newlands Act? That section is a part of the provisions made by Congress to avoid interruption of train service by disputes between carriers and their employees; the remedy generally applicable being the good offices of a Board of Mediation and Conciliation. Section 9 deals with the case of federal receiverships and provides:

"Whenever receivers appointed by a federal court are in the possession and control of the business of employers covered by this act, the employees of such employers shall have the right to be heard through their representatives in such court upon all questions affecting the terms and conditions of their employment; and no reduction of wages shall be made by such receivers without the authority of the court therefor, after notice to such employees, said notice to be given not less than twenty days before the hearing upon the receivers' petition or application, and to be posted upon all customary bulletin boards along or upon the railway or in the customary places on the premises of other employers covered by this act." Comp. St. § 8674.

Without expressing an opinion as to whether in the case of such receiverships the Board of Mediation has any function, it may be said that the section, in granting a hearing before the court, clearly recognizes the right of the court to decide, and in prohibiting a reduction of wages before 20 days' notice is given, the right is clearly implied to reduce them after the giving of such notice. A special and unique mode of service by bulletin board is provided. The "employers covered by this act" are defined in section 1 as being the common carriers in whole or in part by railroad which are engaged in interstate commerce. The employees intended are defined as:

"All persons actually engaged in any capacity in train operation or train service of any description, and notwithstanding that the cars upon or in which they are employed may be held and operated by the carrier under lease or other contract." Comp. St. § 8666.

The "employees of such employers" therefore clearly includes all persons operating the railroad trains at the time the receiver takes charge, and a reduction of their wages is clearly dealt with by section 9.

[11] It is supposed, as is ordinarily the case, that the receiver will continue the business of the railroad without interruption, and that;

tentatively, at least, the employees of the owner will be continued as the receiver's employees. The contention, therefore, that the order in question, being the first establishment of wages by the receiver, was not within the intent of Congress, cannot be sustained. The aim of Congress, being to avoid the interruption of train service which may result from a decrease in pay without the human satisfaction of a prior hearing on the subject, would be defeated by the construction contended for. It must be held, therefore, that the order of February 28th, as to employees dealt with by the Newlands Act, was in violation of said act and to that extent illegal. The order of the court authorizing a reduction of wages of such employees, without the delay of 20 days and the hearing prescribed by the act, was without legal effect, and the action of the receiver under it also without effect, if the section is a valid law.

[12] 6. The validity of the section is attacked on several grounds. On its face it merely declares that the court must hear employees on questions affecting terms and conditions of employment, and where the question is of reducing wages must hear in advance, after 30 days' notice, and provides a mode of service. As a statute of procedure in federal courts it is justified by the constitutional power of Congress to establish inferior courts with the implied power to define their jurisdiction and regulate their exercise of it. It does no more in the matter of wages than direct the court and its receiver not to meddle with the established scale—established with the consent of the carrier—until an orderly hearing after the usual and reasonable time to prepare for it has elapsed.

[13-15] But if it be admitted that in practical operation it fixes wages for 20 days, a law so doing in avoidance of strikes, even where a classification is made of the employees, is a valid regulation of commerce. Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. But it is said the receiver's liberty of contract is violated, in that for 20 days he cannot make contracts for service with others or at a less wage than that formerly paid. The act does not in terms prohibit him from employing others at a less wage, but the court would doubtless not sanction the discharge of old employees solely for the purpose of such employment, contrary to the spirit of the act. But a receiver as such has no general liberty of contract. As an officer of the court he may make only such contracts as the law permits and the court allows. The forbidden reduction of wages is, however, one unconsented to, for such only provoke strikes. That he might, notwithstanding the act, make willing contracts with the old employees for a less wage, is substantially decided in Ft. Smith & Western Railroad Co. v. Mills, 253 U. S. 206, 40 Sup. Ct. 526, 64 L. Ed. 862. A fortiori could he make such contracts with new employees, if the former ones ceased from their employment.

[16] And it is urged that, when a wage is compelled to be paid even for 20 days, which is beyond the power of the road to earn, the statute cannot be constitutionally applied, because it would take property without due process of law and for public purposes without just compensation. It is difficult to see how the maintenance for 20 days, and

until a hearing, of a wage inaugurated by consent of the carrier, could be a serious taking of property. In the case at bar it appears that three-fourths of the wages paid are not affected by the act and may be freely reduced. The amount of train service could no doubt have been cut down. The trainmen, if presented the option of taking less pay for 20 days or suspending entirely, might have agreed to the temporary reduction. As a last resort the operation of the road might have been stopped for the period, since it could not constitutionally be compelled. It does not sufficiently appear in this case that the application of the statute necessarily would have been confiscatory. The order of February 28th should be modified, by excepting from its operation the employees actually engaged in any capacity in train operation or train service of any description.

[17] 7. It is important to settle what employees are included in this description. The language of the Employers' Liability Act of April 22, 1908 (Comp. St. §§ 8657–8665), and of the Hours of Service Act of March 4, 1907 (Comp. St. §§ 8677–8680), and of the Adamson Act of September 3, and 5, 1916 (Comp. St. §§ 8680a–8680d), defining the employees subject to them, is somewhat different in each from that used in the Newlands Act, and little light can be had from a comparison of them or the decisions under them. Section 9 of the Newlands Act seems to restrict its application to those actually engaged in train operation and train service, and indicates that they were persons only who are "employed upon or in cars." The word "car," in the Safety Appliance Act (Comp. St. § 8605 et seq.), was held to include engines and tenders, and no doubt does here.

The common meaning in railroad circles of "train operatives" and "train service men" includes only engineers, firemen, conductors, switchmen, train hands, and porters, and these alone are intended to be covered by this act. They actually and directly operate and serve the trains. Scheduled trains can be run without the assistance of telegraphers, and freight trains may move without station agents and clerks. While all employees of the railroad, whether upon the track, or in the offices or the shops, are necessary to the continued operation of the business, they are not indispensable to an operation for 20 days, and their places are more readily filled and with less peril from inexperience than are those above mentioned as train operatives. These considerations may have guided Congress in drawing the line it did.

[18] 8. The contention is made that the petitioners here have no standing in the court, because they are no longer employees, having on March 5th voluntarily ceased to work. It appears from the evidence that after the order of February 28th was acted upon by the receiver, and his purpose of paying reduced wages to all employees after March 1st was announced by him, the employees at first continued at work under protest. This action on their part prevented any contention that they had agreed to the reduction, and, so long as they continued at work, those affected by the Newlands Act were entitled, notwithstanding the receiver's action, to claim the compensation previously paid them. Unquestionably they have a substantial interest in the correction of the

court's order, which would otherwise operate to control the receiver in his payments to them; and by the express terms of the order all employees, whether protected by the Newlands Act or not, had a right to make a showing to the court upon the question of reduction. Their present showing did not cover the necessity of the reduction or any matter of fact, but did properly bring in question the exclusive jurisdiction of the Labor Board. All these parties had a standing in court to make the points they did under the express provisions of the order and in protection of their rights during the period that they continued at work.