## BIRMINGHAM TRUST & SAVINGS CO. v. ATLANTA, B. & A. RY. CO. (ALABAMA COAL CO. et al., Interveners).

(District Court, N. D. Georgia. June 6, 1924.)

Nos. 156, 187, 188.

1. **Receivers** ⬅155—Coal bills and expense incurred in effort to operate and preserve property must be first paid.

In railroad receivership, coal bills and other expenses incurred in effort to operate and preserve property must be paid before anything can be paid to litigants who have sought and authorized operation, and this applies to coal bills made by receiver prior to entry into case of mortgagees as against latter, whether or not furnishers of supplies acquired a

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

lien under state statute, construed in connection with Judicial Code, § 65 (Comp. St. § 1047); the receivership having been granted for the benefit of all creditors and no showing of improvidence being made.

2. Receivers ⬗78—Lien for coal held to have perished.

Lien for coal furnished railroad under Civ. Code Ga. 1910, §§ 2793, 2795, perished, where no action was taken to enforce it, though bills accrued within six months before receivership.

3. Receivers ⬗160—Receiver could pay for coal sold on faith of current income prior to mortgagees of income.

A receiver, taking over current assets of a railroad, properly paid for coal sold to railroad on faith of current income within a reasonable time before receivership, and this before any results of operation were paid to mortgagees of income, or other debts not of similar equitable merit.

4. Receivers ⬗159—Creditors for current operating supplies have redress, if current operating income diverted.

Though priority of rights of creditors for current operating supplies furnished before receivership is limited to net profits made by receiver, and does not displace lien of mortgagees of corpus, nevertheless such creditors have redress if income which should have been paid to them has been diverted to pay mortgagees of corpus, or to permanently increase or improve mortgaged corpus, providing diversion has not been replaced by funds arising from other than current operating income.

5. Receivers ⬗163—Supply creditors held not entitled to look to net income guaranty of government.

Supply creditors are entitled to have treated as operating revenues so much of the government guaranty under Transportation Act, § 209, as covers operating deficits, but not that part covering the guaranteed net operating income.

6. Railroads ⬗5½, New, vol. 6A Key-No. Series—Note of railway under federal control offset against guaranty.

Note of railway taken over by government during federal control was available offset against guaranty made by government under Transportation Act, § 209, subsec. (h), being Comp. St. Ann. Supp. 1923, § 10071¼dd.

7. Receivers ⬗159—One supplying coal to railroad may complain of previous diversion of income.

Diversion of operating income of railroad may be complained of by one subsequently furnishing coal on faith of current income.

In Equity. Suit by the Birmingham Trust & Savings Company against the Atlanta, Birmingham & Atlantic Railway Company, in which the Alabama Coal Company and others intervene. On exceptions to master's report. Decrees ordered entered.

See, also, 271 Fed. 731, 743; 287 Fed. 561.

Ruben R. Arnold, of Atlanta, Ga., for Birmingham Trust & Savings Co.

Brandon & Hynds, of Atlanta, Ga., for receiver and Atlanta, B. & A. Ry. Co.

Alston, Alston, Foster & Moise, of Atlanta, Ga., for interveners.

Spalding, MacDougald & Sibley, of Atlanta, Ga., for Columbia Trust Co. and Equitable Trust Co., of New York.

Slaton & Hopkins, of Atlanta, Ga., for Old Colony Trust Co.

SIBLEY, District Judge. The Atlanta, Birmingham & Atlantic Railway Company grew out of a consolidation of other railroads and a reorganization perfected in 1915. The reorganization left an im-

portant part of the system known as the Atlantic & Birmingham Railroad under a precedent mortgage in which Old Colony Trust Company, a corporation of Massachusetts, is trustee, and left the whole system under a mortgage, subject to the former one, in which Equitable Trust Company, a corporation of New York, is trustee, and under a third mortgage, subject to both the preceding, in which Columbia Trust Company, a corporation of New York, is trustee. Each mortgage covers physical properties and rents, issues, and profits, has a provision for accelerated maturity in case of defaults as to interest or taxes, or failure to discharge other liens, and for the trustees thereupon taking possession or securing a receivership. The interest on the bonds issued under the last-named mortgage, however, was due only from net income earned each fiscal year ending June 30th.

The system was operated under federal control until March 1, 1920, the corporation being paid for its use a compensation of $480,000 per year. Thereafter, until September 1, 1920, it was operated under the guaranty of section 209 of the Transportation Act (Comp. St. Ann. Supp. 1923, § 10071¼dd), in effect that the net railway operating income for the six months should not be less than $240,000. Operations were at a continuous loss throughout the guaranty period, the company claiming a deficit of $793,402 in addition to the guaranteed profits of $240,000. Of this claim the United States paid from time to time, between September 10, 1920, and February 25, 1921, $764,000, and has paid since $90,000, leaving a balance of $179,402 still claimed by the company to be due. Operations continued to be at a large and steady loss until, on February 25, 1921, a note creditor, holding bonds under the second mortgage as collateral security, obtained a receivership, the company consenting, for the benefit of all creditors, including the mortgagees, on the grounds of the company's insolvency, the increasing burden of taxes, labor and supply liens, the pendency of suits, and the likelihood of a dismemberment of the property and the destruction of its value as a going concern. An ascertainment of the mortgage debt and all others was prayed, and a complete administration of the property sought. Process, however, was asked only against the railway company.

The receiver was ordered to take over all of its assets and to "continue the operation of the railroad and to conduct systematically, in the same manner as at present, the business and occupation of carrying passengers and freight." On February 28, 1921, he was "authorized, in his discretion, from time to time to pay out of the moneys that shall come into his hands operating expenses, taxes, traffic and car mileage balances, and also unpaid pay rolls and supply accounts incurred in operation since August 25, 1920." The receiver's operations were at a loss also. In December, 1921, the trustees of the mortgages not having intervened, they were, by amendment of the bill, sought to be brought in by substituted service, not being found within the court's jurisdiction. They, however, each filed an independent bill, making each other and the receiver and the railway company parties, and each prayed a receiver and foreclosure. By consent these bills were consolidated on March 11, 1922, with the original bill, and the receiver-

ship extended to the consolidated case, without prejudice to any question of priorities. Losses in operation have continued until very recently, and there is yet no net income in the receiver's hands.

Many interventions have been filed by persons having claims against the corporation and the receiver. Those relating to coal furnished before and since the receivership and not paid for have been heard. A very comprehensive and intelligent report made by the special master, fixing their several amounts and priorities, is excepted to as respects some conclusions of law only. The questions raised are: What dignity, as against the mortgages, have these claims found to be' for supplies necessary to operate the railroad and preserve it as a going concern, against income in the receiver's hands or against the proceeds of sale of the corpus of the property for the periods (a) prior to the receivership; (b) during the receivership, before the entry into the case of the trustees; and (c) since their entry? And collateral to these is an important inquiry as to whether funds that should have been applied to current debts have been diverted to the benefit of the mortgages under such circumstances as that they must be accounted for and restored.

[1] 1. The mortgagees in their bill assert, as did the original complaint, the necessity of an operation of the railroads by a receiver to prevent dismemberment and sacrifice until a sale can be made. Though parties now for two years, they have not yet pressed for a sale. The coal bills and other expenses incurred since their bills were filed, in this effort to operate and preserve the property, must by all principles of administration be paid before anything can be paid to the litigants who have sought and authorized the effort. Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379.

2. The coal bills made by the receiver prior to the entry into the case of the mortgagees must be awarded the same priority. They were incurred under the identical order to operate, which is still of force, granted for the same reasons that were later repeated by the mortgagees. While original authorization or consent by them was lacking, and express ratification was guarded against in the order enlarging the receivership, still the power of the court extends thus far. The original receivership consented to by the corporation was valid. Birmingham Trust & Savings Co. v. Atlanta, Birmingham & Atlantic Railway Co. (D. C.) 271 Fed. 731. It was invoked for the benefit of the mortgagees, though they were alleged to be beyond the process of the court, as well as for the benefit of all others. In this regard the bill of the judgment creditor in the Kneeland Case, supra, was quite different from the present one. The need of preserving the property as a going concern in order to effect any sale thereof was fully set forth. The court and receiver were under duty to make the effort so to preserve it. The credit extended to the receiver, asking it under the court's order silent as to priorities, was a credit of the full power of the court to do right in the premises. Had the court at the time expressly made this expense a charge on the corpus, as by an issue of receiver's certificates so providing, the action would have been proper and valid, subject to the right of lienors not then before the court to be heard as to the propriety

of the expenditures.   Union Trust Co. v. Illinois Midland Railway Co., 117 U. S. 434, 464, 6 Sup. Ct. 809, 29 L. Ed. 963.   The hearing has now been afforded, and no word has been offered in criticism.   The receivership was known to the mortgagees immediately.   Its necessity, its purpose, and its fortunes have been a continuing whole.   I think justice demands that no distinction be made in its expenses, whether the furnishers of the supplies acquired a lien under the Georgia statutes, construed in connection with Judicial Code, § 65 (Comp. St. § 1047), or not.   Moore v. Donahoo, 217 Fed. 177, 133 C. C. A. 171, 5 A. L. R. 675.

[2] 3. As to the coal furnished before the receivership, under the Georgia statute debts for labor and supplies furnished a railroad company have a lien superior to mortgages if proceedings are taken to enforce the former within six months of their accrual.   Code, Ga. §§ 2793, 2795.   Hence the permission to the receiver in the order of February 28, 1921, above quoted, to pay all such accruing since August 25, 1920.   The coal bills here involved accrued within six months before the receivership, but no action to enforce their lien was taken in the time limited by the statute, and the statutory lien perished.   Birmingham Trust & Savings Co. v. Atlanta, Birmingham & Atlantic Railway Co., Hardy's Intervention (D. C.) 287 Fed. 561; Valdosta, Moultrie & Western R. Co. v. Atlantic Coast Line R. Co., 148 Ga. 842, 98 S. E. 465.

[3] 4. Nevertheless the coal has been found by the master to be a current debt, made on the faith of current income within a reasonable time before the receivership.   Under settled doctrines, such debts must be discharged by the receiver, who took over the current assets before any results of his operations can be paid to the mortgagees of income or to other debts not of similar equitable merit.   The reasons for this equitable charge on the operating income are fully stated in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, and applied to coal debts in Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596, and Virginia & Alabama Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 18 Sup. Ct. 657, 42 L. Ed. 1068.   It attaches to the net operating income that the receiver may make throughout the receivership.   Texas Co. v. International Railway Co., 237 Fed. 921, 150 C. C. A. 571; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596.   But should he not make any such net income, payment of these claims must fail, because to require the receiver to pay them and force the expense of the receivership on the corpus would be in effect to make them a charge on the corpus.   By a well-considered line of decisions in the Sixth Circuit, culminating in Gregg v. Mercantile Trust Co., 109 Fed. 220, 48 C. C. A. 318, Gregg v. Metropolitan Trust Co., 124 Fed. 721, 59 C. C. A. 637, and confirmed by Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, the priority of such claims is limited to net profits made by the receiver, and does not displace the lien of the mortgages on the corpus.

[4-6] 5. Nevertheless the creditors for current operating supplies furnished before the receivership have redress if current operating income which should have been paid them is by the corporation of the receiver diverted to pay the mortgagees of corpus, or to permanently

increase or improve the mortgaged corpus, provided the diversion has not been replaced by funds arising from other than current operating income. Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; St. Louis, Atchison & Topeka R. R. Co. v. Cleveland R. R. Co., 125 U. S. 658, 8 Sup. Ct. 1011, 31 L. Ed. 832. Whether such diversion occurred in this case depends on the status and disposition of the money due by the United States for the guaranty period. On March 1, 1920, the railway company started with a clean sheet so far as operations were concerned. Operating income and expenses prior to that date appertained to the United States. By section 209, subsec. (c) of the Transportation Act, for reasons satisfactory to Congress, the United States guaranteed that for the next six months the railway operating income should pay the railroad operating expenses and leave a net operating income of $240,000. By subsection (h) such advances against the guaranty were permitted "as are necessary * * * to meet its fixed charges and operating expenses." While the guaranty is addressed to the carrier, and not to its creditors, it seems to have been intended to enable the carrier to function by giving it credit for operating expenses and to the extent of the net income guaranteed for its fixed charges also.

Supply creditors may be said, under these extraordinary circumstances, to have been entitled to look to so much of the guaranty as applies to operating expenses in much the same way as under ordinary circumstances they are held entitled to look to operating revenues, and with a similar implied understanding on the part of the mortgagees, that funds collected from the government to supplement the operating revenues would be applied to operating expenses. At the end of the guaranty period the company could not have justly collected its deficit of $793,402 from the United States and paid it over to its mortgagees or to the improvement of its property, and have left the supply debts unpaid. On the other hand, with equal justice it may be said that the guaranteed net income, in this case $240,000, was free to be applied to fixed charges, including bond interest, and to capital improvement. This is the reasonable intent of Congress, expressed in the provision of the act concerning advances, and was the probable understanding of all parties concerned. The company, therefore, was free to use $240,000 for bond interest and betterments without any diversion from the current debt fund spoken of in Fosdick v. Schall and subsequent cases.

The United States, however, holds the note of the railway company for $200,000, taken over during the period of federal control from National Bank of Commerce. This note was an available offset against the guaranty, and was so used by the United States on August 17, 1921, during the receivership, to cover interest and $20,000 principal then due. The balance of the guaranty still unpaid, approximately $180,000, will no doubt be discharged, if it has not already been, by offsetting the balance of this note. $200,000 of the $240,000 available for general payments was thus absorbed in advance, leaving only $40,000 really free for fixed charges and betterments, the guaranty fund being otherwise to be devoted to discharging the operating deficit. On September 1, 1920, the company had about $995,000 in unpaid operating expenses,

with $303,342 in cash on hand, leaving a deficit of $691,658, which adjustment of balances with other railroads might have affected one way or the other.   On September 10th the United States paid $100,000, which was put in the common treasury.   On September 17th another $100,000 was paid, which was deposited with Columbia Trust Company, to be available to pay interest on the income mortgage bonds for the year ending June 30, 1920.

That income must have been earned seems fairly clear, as the United States was paying or guaranteeing $480,000 per year for the use of the property, unless it was absorbed by outside losses.   Though the payment is not yet absolute, since the trustee will no doubt offset the deposit against the principal of the mortgage if the interest proves not to be due, it will be treated as a final payment.   To the extent of $40,000 it was not a diversion.   The guaranty money was not produced by railroad operation, and except as to money so produced there is no right of supply creditors to be first paid.   The entire obligation of the government on its guaranty must be considered as ultimately good.   The $240,000 free to pay interest charges is certain in amount.   If anything is contested in making settlement, it is the result of operations in which the supply creditors are interested.   There is no equity to compel fixed charges to delay enjoyment of payment of their money until settlement can be effected of that applicable to operating expenses.   The company had a discretion to make fair application of the guaranty payments as received.   Having turned the first $100,000 to supplies, it might fairly pay the $40,000 to fixed charges.   The $60,000 that was paid additionally was a diversion as against supply creditors.

6. The 22 items in the master's report of property purchased and improvements made between October, 1920, and June, 1922, amounting to $10,634.96, are correctly held permanent improvements of the respective mortgaged properties as indicated by the master.   The items of street drainage and paving were correctly held not such.   It does not appear that they were other than mere repairs, or that they in any case added anything to the value of the railroad.   Such things are often merely a part of the current burden of operating a railroad, occasioning an improvement to the street but none to the railroad.   The master's judgment on the facts as to these will not be disturbed.   A similar conclusion is reached as to the items of personal property disallowed as diversions.   They may have been mere replacements and many of them, especially the automobiles, must have been worn out before now in the service of the receiver, in an effort to make an income for the payment of operating creditors.

7. The payments to Birmingham Trust & Savings Company and National Bank of Commerce, including the deposit with the latter, set off by it, were on notes secured by bonds issued under the Equitable Trust Company's mortgage.   These payments were credits both on the notes and on the collateral bonds, and stand as to these bonds as though the payment had come through the trustee.   These sums, aggregating $14,682.08, as well as the $103,238 paid as interest and income tax on the Old Colony Trust Company's mortgage on December 31, 1920, are diversions as against supply creditors.   Of these all date before the

receivership, except items of tracks and water station and yard lights, amounting to $1,847.59, which were diverted during the receivership. The $97,000 paid February 23, 1921, to Guaranty Trust Company on the equipment trust was found by the master to be a diversion, but since the trustee which received the money does not appear to be a party to this litigation, it cannot be so held at this time.

[7] 8. Many of these diversions occurred before any of the coal now owed for was delivered, of which only $312 dates as far back as November, 1920. It was held by the master that one supplying a railroad cannot complain of a previous diversion, though unknown. To this I disagree. In this case, during the guaranty period, the railroad ran on the credit afforded by the guaranty of the United States. Since the end of the period the deficit of about $700,000 has been paid, in addition to the diversions, by operating revenues arising since, assisted by the guaranty payments, with the result that, payments having fallen several months behind, current debts for December, January, and February were unpaid at the beginning of the receivership. There was no impropriety in thus running everything through a common treasury, and there should be no difference in the result. The case is not one of tracing any particular fund, but one of fair, equitable accounting. Nor is the account between the divertee and some particular supply creditor, but between the divertee and the current debt fund in which all the unpaid supply creditors were interested. Which of them were left unpaid is an accident of no concern to the divertee. The deficit of the guaranty period was properly first paid by the company, not only because of the usual practices of railroad operation, but because they were largely statutory liens, and had to be paid under the state law, and also because means for their payment was furnished by the guaranty payments.

The supply claims accruing since the guaranty period, that were not paid, were unpaid because of the diversions and the loss in operation since the guaranty period. The latter loss they must bear, unless the receiver should make a net profit later. The former must be restored by the beneficiaries of the several diversions. The nonpayment of supply creditors is caused as directly by a diversion occurring just before the coal was supplied as by one occurring just after. Probably the six-months period ought to limit the inquiry as to diversions, as it does as to supplies. Beyond that arbitrary limit it may be impractical to trace results. In this case, however, all has occurred within that period and the effect of it on the current debt fund is transparently evident. Except as to the $40,000 allowed as a proper payment to Columbia Trust Company, there has been no money save the current debt fund. At no time was the fund able to pay current operating expenses, in cash or otherwise. Subtractions from it necessarily unjustly deprived some current supply creditor of his payment, and it should not be in the power of the subtracter, by preferring the older creditors, to nullify the effect of the subtraction.

For the arbitrary six-months period, therefore, all diversions will be considered a fund, and all current supply claims now unpaid, the pro rata distributees of it. No other course is just or practicable. Moore v. Donahoo, 217 Fed. 177, 133 C. C. A. 171, 5 A. L. R. 675. The

actual raising of the fund must await the sale of the property and the appropriation from the proceeds of the property of the amounts chargeable to the shares of those who have received the benefit of the diversions, with interest since they occurred. Its distribution, of course, must also await the final ascertainment of all supply claims entitled to participate. No propriety is perceived in issuing receiver's certificates for any of these debts. The certificates would have no greater value or currency than the decree for the debts.

A decree may be entered for the several amounts found by the master to be due each intervener for coal furnished to the receiver, divided as found by him between the railroads separately mortgaged, to be paid before any payment is made to the several mortgagees thereof. Where more than one mortgage exists on the same railroad, of course the prior mortgage will not contribute to the expenses, so long as any surplus remains to meet them. A decree may also be entered for the amounts due for coal furnished prior to the receivership, to be paid pro rata with other similar debts out of any net income finally shown by the receiver at the termination of the receivership and out of the fund raised by restoration of the diversions occurring before the receivership, which diversions are to be decreed due, with interest from the time of their diversion, by the several parties who received them and to be restored by deductions from their several shares in the proceeds of the sale of the railroad when that shall occur.

Diversions by the receiver are to be accounted for only if he makes a net income, or if the restoration of them would produce a net income.