## PIEDMONT CORPORATION v. GAINESVILLE & N. W. R. CO.

District Court, N. D. Georgia. January 31, 1929.

Geo. M. Napier, Atty. Gen., and McMillan & Erwin, of Clarkesville, Ga., for the State of Georgia.

Wheeler & Kenyon, of Gainesville, Ga., for complainant.

Madison Richardson, of Atlanta, Ga., and Dean & Wright, of Gainesville, Ga., for investors.

Watkins, Asbill & Watkins, of Atlanta, Ga., for receiver.

Kelley & Kelley, of Gainesville, Ga., for judgment creditor.

Clint W. Hager, U. S. Atty., and C. P. Goree, Asst. U. S. Atty., both of Atlanta, Ga.

Ed Quillian, of Gainesville, Ga., for claimants.

SIBLEY, District Judge. The Gainesville & Northwestern Railroad extends from Gainesville, Ga., where there are other railroads, northwardly through Hall and White counties, to the stone quarries of the Piedmont Corporation, serving the quarries and the intermediate territory as a common carrier. Its entire capital stock is owned by the Piedmont Corporation. In 1921 it became embarrassed by debt, and on January 3, 1922, the United States loaned it, under the provisions of section 210 of the Transportation Act (41 Stat. 468), $75,000 secured by $75,-000 of bonds which were themselves secured by a mortgage on the railroad to Investment Savings Company as trustee, and the debt was also guaranteed by the Piedmont Corporation. No interest was paid on this debt, and the railroad company became further indebted to Piedmont Corporation, to connecting railroads, to coal dealers and others, its track got in bad condition, and on November 8, 1923, Piedmont Corporation filed a bill to have foreclosed the mortgage securing the bonds and to assert an equitable lien for its advances, and prayed for a receiver. The trustee for the bonds, Investment Savings Company, was made a party.

The railroad company answered, admitting the allegations of the petition, and joined in the prayer for a receiver. One was appointed December 8, 1923, with authority to maintain and operate the railroad, but without express authority to borrow money or otherwise to incur indebtedness. Receiver's certificates for $25,000 were later regularly authorized, after due notice, and other smaller loans were also permitted. The railroad operations were at a steady loss, but no one pressed for a sale. The court, in November, 1927, of its own motion, ordered all claims to be filed for audit before the master by a fixed date, that the matter might be closed. The United States then intervened on January 13, 1928, claiming priority for its debt under the laws of the United States, but opposing a sale of the road. Matters dragged on until the court, of its own motion, again set a hearing for January 12, 1929, to finally fix priorities and arrange for a sale.

The special master's reports have now been brought in review and argument had on the question of priorities, which are now to be ascertained. For present purposes the claims may have this classification: (1) The debt due the United States. (2) Taxes due state, counties, and municipalities. (3) Costs of court and administration. (4) Receiver's certificates. (5) Debts due by the receiver for supplies, services, and money. (6) Debts of the corporation for services and supplies within six months before the receivership. (7) Judgments for torts committed during receivership. (8) Other debts due by the corporation.

Turning first to the debt of $75,000 due the United States, it must be borne in mind that the United States have no priority by virtue of sovereignty. It is well settled that such priority as is granted by the statutes is to be observed, but that, when the United States sue or consent to be sued in court, their rights are otherwise only such as the principles of law and equity recognize in other litigants, and are to be determined as between man and man. Brent v. Bank, 10 Pet. 596, 614, 9 L. Ed. 547; Rhode Island v. Mass, 12 Pet. 657, 737, 9 L. Ed. 1233.

The bond mortgage has no other or higher dignity than if the bonds were held by some other person, and falls within the familiar rules for administering railroad assets in the hands of a receiver. The principal debt, however, is one due directly to the United States for money taken from its treasury under section 210 of the Transportation Act, and to go back to the treasury when repaid, and is plainly public funds. It is such a debt as is entitled to the protection of the priority statute, United States Code, tit. 31 (31 USCA) § 191, formerly R. S. § 3466. That section applies to all indebtedness to the United States when the debtor is insolvent and is circumstanced in any of the ways set forth therein. United States v. Fisher, 2 Cranch, 358, 2 L. Ed. 304; Beaston v. Farmers' Bank, 12 Pet. 102, 9 L. Ed. 1017; United States v. Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638.

Although a railroad company is not subject to the Bankruptcy Act (11 USCA), and although the receivership here was not granted expressly because of insolvency, nevertheless the company was and is entirely insolvent, and the passage of its property to the custody of a receiver for the benefit of all creditors was accomplished by its consent, as appears not only from the answer,

but from the correspondence leading up to the filing of the bill. This was the equivalent of a voluntary assignment within the statute liberally construed, as was held proper in Price v. United States, 269 U. S. 492, 46 S. Ct. 180, 70 L. Ed. 373; Bramwell v. United States Fidelity & Guaranty Co., 269 U. S. 483, 46 S. Ct. 176, 70 L. Ed. 368. The statute thereupon requires that the debt due the United States "shall be first satisfied." Yet from the first to the last of the above-stated cases it has been said that the statute gives a priority and not a lien, and it does not displace or affect a valid transfer or lien made in the usual course of business before the situation occurred which gave rise to the priority under the statute. Thus the lien of a bank under its charter upon its stock for debts due it by its stockholders was held superior in Brent v. Bank in 10 Pet. 596, 9 L. Ed. 547. But apparently only a transfer of or a lien on special property arising in some way from a contract is to be excepted, for the general lien of a judgment was said to be inferior in Conard v. Atlantic Insurance Co., 1 Pet. 386, 443, 7 L. Ed. 189.

It would seem, therefore, that laws undertaking to give a general lien on all the property of the debtor are not to be considered as transfers or liens in the course of business, but rather as efforts of the state law to establish other priorities, which must fall when they conflict with a constitutional act of Congress. This section was said to be such in United States v. Fisher, supra. The contest there was between the United States and citizens. Mention was indeed made in the opinion of possible conflict with the taxes due to the states and their political subdivisions, but the question was dismissed rather cavalierly and without the deliberate and careful examination that so serious a question would have received at the hands of the Chief Justice had it really been involved in the case. It was presented actually in United States v. Oklahoma, supra, but not decided by the court. My mind rather sticks at the effort to find anything in the Constitution that could be said to authorize the Congress to require that the United States be paid all debts due them in preference to the revenues due to the States.

The functions vested in the states by the people of the United States are of equal value and dignity with those vested in the central government, and neither is at liberty to cripple or destroy the other. On this ground the broad powers of taxation given the federal government have been held not to extend to the taxation, directly or indirectly, of the instrumentalities of the state governments. Whether the same principle would not lead to the conclusion here that Congress did not have the power, or did not by such general language express an intent to prejudice state revenues by the federal priority statute, with the result of an equitable prorating between the two governments, deserves deliberate examination. But no question of the constitutionality of the statute as against state revenues has been made or argued here, and I find it unnecessary to decide it any way because of what next follows.

■ While the United States were not originally parties to the proceedings asking a receiver, the evidence shows that the Secretary of the Treasury was advised with, and he in turn advised with the Interstate Commerce Commission, which had certain responsibilities in the premises under the Transportation Act, with the result that the receivership was agreed on in advance, and even the person to be suggested as receiver. The District Attorney here was directed to protect the interests of the United States, and he in fact kept in touch with the proceedings. The trustee for the bond mortgage was at once made a formal party. Notwithstanding the continual loss of the receivership shown by monthly reports filed in the court, no one asked for its termination, and when the court, a year ago, itself sought a termination, the United States formally intervened to oppose a present sale. During the four years of the receivership the state and its counties were, each year, pressing for payment of their taxes which, under the state law were a first charge against corpus and income. But the income was all paid out for operating expenses and sale of the corpus was not forced by the court to pay these relatively small charges. All of the unpaid taxes accrued during the receivership.

One of the counties involved is actually embarrassed financially for want of its revenue. I do not think the greater debt holders, including Piedmont Corporation and its affiliated interests, the trustee in the mortgage and the United States with their priority, could thus for four years, under the guise of a protective receivership, operate this property in hopes of its financial rehabilitation, under the protection of the state and through use of the franchise granted by it, and yet refuse to permit payment of the annual taxes meanwhile. But for the possession of this court the State could each year have forced payment, and it seems wholly inequitable for the court now to refuse it.

As litigants in equity both the mortgagee and the United States ought to yield their priorities to taxes as a necessary expense of administration. That the mortgagee must yield to such expenses is settled by authority and the federal priority would be subordinate to the specific lien of the mortgage if the two had happened to be in conflict. See Birmingham Trust & Savings Co. v. A. B. & A. Railroad (D. C.) 300 F. 173; Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 S. Ct. 950, 34 L. Ed. 379; Kenebeck Box Co. v. Richards Corp. (C. C. A.) 5 F. (2d) 951.

Under the same reasoning fall the other expenses of administration, such as the personal expense account of the receivers (they claim no salary or compensation), the allowances heretofore made to counsel and special master, and past and future court costs and expenses of sale.

And following these in dignity come the valid debts of the receivership itself. First among them should rank the receiver's certificates for $25,000 to which the court engaged itself to give a first dignity in distribution. Next to these come the other debts for money which were authorized by the court, and those for labor, fuel, material, and other things necessary to operate the railroad, as established by the master. A large aggregate of these have been taken up by Mr. Hyde and the Piedmont Corporation and others connected with it, as assignees thereof. This gave the receiver a false credit and enabled him to incur a much greater amount of such indebtedness than would have otherwise been possible or than was realized by the court. Nevertheless I think the obtaining of these things was within the authority given him to maintain and operate the railroad, and that the assignment of the claims does not detract from their dignity and validity, and that they must be recognized as debts of the receivership. For many of these debts the assignees did not pay face value, and the master allowed them priority only for the amount paid for them.

I do not perceive in the record any evidence of an agency on the part of these assignees for the receiver or for any other party to this cause, nor any relationship of trust which would require them to account for any profit made in these purchases. There was a question as to whether they would be disallowed as unauthorized, and also of their priority, and of there being anything to pay them with, which might have justified the reduced cash value put on them in selling them. They ought to be allowed for their face amount.

But these assignees also directly loaned the receiver money amounting in the aggregate to many thousands of dollars, entirely without the knowledge or authority of the court. While the court has power, on notice, or without notice in emergencies, to authorize the borrowing of money to the displacement of mortgages and other prior claims, the receiver has no such power. It may be argued that there is no difference between getting coal or other things on a credit and borrowing money to pay for them. Yet the law is very jealous of an official's handling of cash. Cash is much more easily dissipated, misapplied, or lost than coal or other things. Often public officers may buy merchandise, but may not borrow money without many formalities, perhaps a public election. These advances of money were plainly made because of the interest of the Piedmont Corporation to keep the road running, possibly in the belief that the court would not authorize any more loans to the detriment of other claims, and certainly with the knowledge that the receiver had no power to borrow money without an order of the court. Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 476, 6 S. Ct. 809, 29 L. Ed. 963. These loans will not be given priority.

The large item of engine rentals allowed Hyde Investment Company while in substance a proper claim against the receivership and entitled to priority as a debt thereof, seems not to have been very thoroughly examined as to amount. A re-reference of this item may be moved, if desired.

The judgments for torts committed during the receivership have no added dignity because in judgment. They are, however, debts of the receiver and rank with other such debts.

The equitable claim against net income for wages and supplies furnished within six months before receivership has no application here, for there has never been any net income. Birmingham Trust Co. v. A. B. & A. R. Co. (D. C.) 300 F. 173. But by sections 2793 and 2795 of the Code of Georgia, enacted prior to the making of the mortgage here involved, employees are given a lien on the railroad and other property of the company, and furnishers of supplies necessary to operate the railroads and persons having damage claims are given liens upon all the property of the company all expressly superior to mortgages. By sections 2794 and 2796 receivers of railroads are required to recognize

these liabilities against the company incurred prior to the receivership and to pay them out of available funds. If these instructions to receivers are applicable to a federal receiver they cannot be enforced here, for no funds have been or are available, nor will there be unless the proceeds of the sale of the property are such.

As to such proceeds it may be that the statutory liens are superior to the mortgage under the state laws, if not barred by the limitations of the statute creating them (see Birmingham Trust & Savings Co. v. A. B. & A. R. Co. [D. C.] 287 F. 561), or by failure to enforce them in time (Id. [D. C.] 300 F. 173). But the so-called liens must yield to the priority given the United States, for being generally applied to all the property of the company, they are really only a priority in distribution like a judgment lien, which must yield to the statute of Congress as construed by the Supreme Court. This not being a case in bankruptcy, the ruling in Guarantee Title & Trust Co. v. Title Guaranty & Surety Co., 224 U. S. 152, 32 S. Ct. 457, 56 L. Ed. 706, is not applicable to save even the claims of laborers. There are, by the state laws, special liens for labor and for material used in the improvement of specific property as to which a different rule might be proper, but none such have been asserted in this case. ▆▆ Code Ga. § 2788, gives a lien on gross income in the hands of a receiver for injury to person and property by the operation of the railroad, and while the receivers here have no gross income now in their hands, it is said that some of it, to wit the earnings for mail carriage, amounting to several thousand dollars, have been kept back by the United States as a set-off on its debt, and that this is a diversion thereof for which the United States are accountable within the principles discussed in Birmingham Trust Co. v. A. B. & A. R. Co. (D. C.) 300 F. 173. It need not be examined whether this lien statute applies to a federal receiver, nor whether this retention constitutes a diversion of income, because, if these earnings should now be paid into court, they would be appropriated by the priority due to the United States. This so-called lien on gross income is also only a state statute of priority which must yield to the federal statute. The earnings have already been applied properly as against the complaining creditors, and the application need not be disturbed.

The general scheme of priorities to apply in the distribution of the proceeds of sale of the railroad company's property is therefore as follows: (1) Court costs, expenses of sale, compensation, and expenses of officers of court, including receivers, attorneys, and special master. (2) Taxes, state, county, and municipality. (3) Receiver's certificates. (4) Other debts of the receivership authorized by the court, not including unauthorized loans of cash, but including tort liabilities. (5) The debt due the United States. (6) Unbarred liens under the state laws for wages, supplies, and damages due by the corporation before receivership. (7) The bond mortgage. (8) Other debts due by the corporation, including any unauthorized loans to the receiver, which can be shown to have been used for the benefit of the corporation.

It is directed that a decree be submitted by counsel for the complainant and for Investment Savings Company on Saturday, February 9, 1929, which shall embody the above announced conclusions as to priority, and which shall provide for a foreclosure of the bond mortgage, and for the sale of all the property and franchises in the hands of the receiver of the Gainesville & Northwestern Railroad Company, with leave to the purchaser to run the railroad, or discontinue and dismantle the same at his option, so far as it may be found lawful so to order. A reference to the master after sale may be moved, to ascertain specific distributions of the fund, if necessary.