**NATIONAL BEN. LIFE INS. CO. et al. v. SHAW–WALKER CO. (HILLYARD et al., Interveners) et al.**

No. 7376.

United States Court of Appeals for the District of Columbia.

Decided Jan. 8, 1940.

Rehearing Denied Feb. 21, 1940.

John E. Laskey, Francis C. Brooke, and Thurman L. Dodson, all of Washington, D. C., for appellants.

Levi H. David, R. H. McNeill, and Henry Lincoln Johnson, Jr., all of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and STEPHENS and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a decree establishing a receivership in a statutory dissolution proceeding (D.C.Code, 1929, Tit. 5, § 416) for the National Benefit Life Insurance Company, a District of Columbia corporation, at the instance of judgment creditors, plaintiff, Shaw-Walker Company, and intervening individuals, and an intervening policyholder. The decree held that a prior equity receivership had been created by the same court in excess of its jurisdiction and should be superseded by the statutory proceeding and receivership. It is challenged here by the equity receivers, acting for themselves and for the company.

The equity receivership was set up in September, 1931, pursuant to an amended petition filed by John R. Pinkett, a stockholder, officer and policyholder, who sued in his own behalf and as attorney in fact for 341 other policyholders. The bill followed closely upon the discovery of long continued and carefully concealed misconduct by some of the managing officials, which culminated in the resignation of all officers and the election of new ones in

June, 1931. The company, a stock corporation, conducted its business in twenty-two states (chiefly southern and midwestern) and the District of Columbia. As of February 29, 1932, according to company actuaries, insurance in force exceeded $35,000,-000, represented by more than 130,000 policies. Of these over 115,000, aggregating in excess of $20,000,000 insurance, were industrial policies, written largely for Negroes in amounts not exceeding $500 for life and $20 per week for health and accident on the weekly premium basis. The annual report for 1930 valued the company's assets at $5,-541,000, and disclosed an apparently sound financial condition. Revelation of the contrary fact resulted in suspension of licenses to do business by the insurance authorities of several states. In these circumstances and after consultation with the District and state commissioners, the newly elected officers and legal advisers, Pinkett filed his bill pursuant to a general understanding that an "operating" receivership would afford the best, perhaps the only, means for rehabilitating the company or, if that should prove impossible, for conserving its assets and salvaging some part of the business.

The bill as amended alleged, among other facts including some previously mentioned, the existence of unpaid policy claims of $100,000 and of other sums due policyholders aggregating $150,000; the pendency of litigation against the former officers on account of their misconduct; impairment of the capital so far that $1,000,000 would be required to make up the deficiency and impaired legal reserves; fraudulent overissue of the capital stock; the appointment of a temporary receiver in Georgia for the company's assets there; suspension of its licenses to do business in Alabama, Missouri and North Carolina; the pendency or threat of receivership proceedings in Texas and Tennessee; insolvency of the company; that litigation arising out of its underwriting of another insurer's liabilities was threatened as a result of its insolvency; and that unless the court should take jurisdiction of the cause and appoint a general receiver to take over and preserve all the assets, they would be destroyed by reason of the pending claims, threatened litigation, and actions of public insurance officials. The prayer was for the appointment of a receiver, or receivers, "to manage, operate and control * * * pending further order of the Court, or a final determination"

of the case; and that "upon final hearing of said cause the said temporary receivership may be made permanent, and that such action may be taken by the Court by way of dissolution of said corporation, or in such other manner as to the Court may seem just and proper and the equities of the case demand * * *." There was also a prayer for general relief.

A receiver pendente lite was appointed with authority to take possession of the books, records and property; to carry on the business as a going concern; and "as soon as may be to report to the Court with respect to the condition of said corporation and the practicability of rehabilitating and restoring it to a safe and sound condition." The usual injunction against interference with the receiver was issued.

In November, 1931, the temporary receiver reported that the company had a net worth of $2,396,749, but that there was an impairment in its legal reserves of $2,828,-380; and that the shareholders should be given opportunity to make up the deficiency, but on their failure to do so, the corporation should be reorganized into a new mutual company as the only practicable method of resuscitating it.

Later the company, by its president, John T. Risher, answered, admitting Pinkett's material allegations, particularly the precarious condition of its affairs, but not its insolvency; setting forth further facts regarding a "Conference Examination" by the Insurance Commissioners of the District, Virginia, Kentucky and South Carolina, and the disclosure through this examination that the capital stock had been "entirely wiped out and depleted" and that the assets were insufficient to meet the legal reserve requirements of states where the company was operating. The answer further averred advice of counsel that only by an operating receivership could the remaining assets be conserved and protected for the benefit of all in interest. The prayer was that the court consider and dispose of the cause "as will best protect the interest of all concerned," in effect consenting to the relief asked in the bill.

In February, 1932, the court entered a decree holding the company "insolvent," replacing the temporary receiver (who had resigned) with permanent ones, authorizing them to carry on the business, except for writing new insurance, and directing them to have made a complete actuarial report and account of the company's affairs. The

injunction against interference was continued, and the court specifically deferred "any decree for dissolution" until after filing of the actuarial account and report "so as to afford ample opportunity to said company, its officers, stockholders and/or policyholders to formulate and effectuate any plan for the rehabilitation or reorganization of said company * * *. "[1]

Pursuant to the decree, the receivers began ancillary proceedings in eleven states. With the court's approval they modified or revived more than 60,000 previously existing policies, reducing death benefits and withdrawing disability provisions; thereby obtaining resumption of premium payments. No new policies were written. Believing that the modified business was sound and could continue if not hampered by the remainder, the receivers attempted, without success, to dispose of it by sale or reinsurance. This failing, and no feasible plan for rehabilitation having been presented, in August, 1933, the court entered an order, in effect, for liquidation, directing also that collection of premiums be stopped. On December 8, 1937, the receivers reported that liquidation was practically complete, and the court directed that creditors be notified to file formal proofs of claim with the auditor of the court or with the receivers. In February, 1938, plaintiff, the Shaw-Walker Company, and the intervening judgment creditors herein filed proofs of claims on their respective judgments with the Pinkett receivers.

The present statutory proceeding was begun May 12, 1933, process being served on the president, John T. Risher. The bill complied in all respects with § 416, alleging among other facts the corporation's insolvency, the suspension of its business, the plaintiff's judgment against it, with return of execution "nulla bona," and the company's ownership of property within the District and elsewhere. It attacked the court's jurisdiction to institute the prior (Pinkett) receivership, asserting its inva-

lidity for defects in the bill claimed to be jurisdictional. The prayer was for dissolution, appointment of receivers, sale of the property, distribution of the proceeds, and an injunction to restrain others, including the Pinkett receivers, from interfering with those so appointed. The interveners joined in the prayer of the bill. The Pinkett receivers appeared for the company and moved to dismiss the suit. The motion was overruled, the motion justice holding that the court had jurisdiction in both proceedings, that the Pinkett receivers should retain control of the property for liquidation, but that nevertheless the court had jurisdiction in the Shaw-Walker case to dissolve the company.

The case came on for final hearing before another judge on December 10, 1937. In November following, the court filed an opinion holding that it had been without jurisdiction in the Pinkett proceeding, that the relief prayed in the Shaw-Walker bill should be granted, and that the Shaw-Walker receivership should supersede the Pinkett one. Subsequently the Pinkett receivers' motion for rehearing was denied, as was another made the previous July for leave to file a supplemental answer setting forth the filing of proofs of claim in the Pinkett proceeding by the plaintiff and intervening judgment creditors herein. In March, 1939, the court made its findings of fact and conclusions of law, and entered its decree appointing John T. Risher as receiver, also enjoining the Pinkett receivers, with others, from interfering with the dissolution receivership. The appeal is from this decree.

The issues most vigorously argued below and here are: (1) Whether the trial court had jurisdiction to establish a receivership in the Pinkett case; (2) whether, if so, the Pinkett receivership is superseded by the Shaw-Walker one; and (3) whether the conduct of the Pinkett receivers, approved by the court, was proper. Subsidiary issues, noticed later, present the jurisdictional

---

[1] Though the court found the company "insolvent" in the sense that it could not pay debts, death benefits, loans to the insured, and surrender values on policies, the extent of the "insolvency" was held a "matter of accountancy" and the court specifically refused to find that shareholders might not possibly receive some dividend on their stock at the final accounting. Asserting its power then to decree a dissolution and distribution of assets, it refused to do so out of regard for "nearly 200,000 poor people that are interested in this litigation." The reason assigned for deferring dissolution was to give these and others interested opportunity, pending receipt of the actuarial report, to formulate some plan for saving the company and "their little savings."

question in varied forms, including the right of the Pinkett receivers to appear in this cause and to prosecute the appeal on behalf of the company and the question whether process has been made effective against the company by service on the president, not on the receivers. It is contended also that the Shaw-Walker Company and intervening judgment creditors have abandoned their attack on the Pinkett receivership or estopped themselves to question its validity by filing and proving claims in it.

I. We think the trial court erred in holding that it had no jurisdiction to establish the Pinkett receivership. The jurisdiction is attacked on each of two theories concerning the nature of the proceeding: (1) that it was an effort to secure a statutory dissolution and incidental receivership under Title 5, §§ 416, 417 or possibly under §§ 391, 395 of the Code; (2) that it was an attempt to invoke the general equity jurisdiction of the court. In the former view, it is claimed that essential allegations required by the statutes are lacking; in the latter, that the court has no power, apart from the statute, to grant a dissolution or, that being eliminated as the only ultimate relief sought in the bill, to entertain a proceeding the sole object of which is to secure a receiver-

ship. These contentions were accepted by the trial court as the bases for its decree.

Underlying them are the implicit assumptions that the statutory provisions for dissolution are exclusive of all other methods and that the statutory requirements, specifically those lacking here, are jurisdictional; that liquidation of the corporation's business is identical with dissolution in the statutory meaning; that receivership, particularly one for liquidation, can be had only as incident to a statutory dissolution; that the court below has no general equity jurisdiction to institute an operating or a conserving receivership apart from the granting of other and primary relief; and that the primary object of Pinkett's bill was dissolution of the company, with a receivership as incidental thereto.

The statutes of the District provide four methods by which a District corporation may be dissolved and its affairs wound up incidentally to the dissolution.[2] Clearly, the Pinkett bill as amended does not comply with the requirements of § 416 or of any of the other statutory procedures. Pinkett was not a proper party to institute the suit under either § 416 or § 391,[3] and, though possibly sufficient to meet the requirements of § 391, the bill was lacking in substantive allegations which § 416 specified should be

[2] They are set forth in the general incorporation act, Tit. 5, c. 13, §§ 391–419, D.C.Code (1929): (1) dissolution by shareholders (§§ 404, 405); (2) involuntary dissolution at the suit of the United States for acts constituting cause for forfeiture of the charter (§§ 409–414); (3) voluntary dissolution at the suit of a majority of the officers or directors or a specified percentage of stockholders, etc. (§§ 391–403), with provision for a receivership to carry out the liquidation; and (4) involuntary dissolution at the suit of judgment creditors (§§ 416–419). There was no pretense of voluntary dissolution by shareholders or of involuntary dissolution at the suit of the United States or the district attorney.

Under § 391 a suit for voluntary dissolution must be brought by a majority of the officers or directors, or shareholders representing one-third or more of the capital stock, or by "such directors, trustees, or other officers" when authorized by "a majority of the stockholders." Causes specified are the reduction of assets so far that the corporation cannot pay "all just demands against it or offer a reasonable security to those who deal with it" or that those suing "deem it bene-

ficial to the interests of the stockholders that the corporation be dissolved." Section 392 requires annexation to the petition of a full inventory and account of assets, capital stock, incumbrances, unsatisfied obligations, etc. Dissolution is the only specified ultimate object of the suit, but provision for appointment of a receiver is made.

The language of § 416 is: "When any corporation in the District has remained insolvent for a year, or has neglected or refused for that period to pay and discharge its notes or other evidences of debt, or has, for that period, suspended its ordinary and lawful business, a bill may be filed by the district attorney * * * for the dissolution of said corporation, or, if he shall decline to do so, on the application of any judgment creditor of said corporation, the said judgment creditor, if an execution upon his judgment shall be returned unsatisfied, in whole or in part, may file such bill." Section 417 confers power to establish an incidental receivership.

[3] He was not a judgment creditor (§ 416), nor did he purport to sue on behalf of the majority of the directors or officers, or as the representative of one-

made.[4] It is claimed that each of these defects was jurisdictional and therefore that the bill failed to invoke the court's power both for want of a proper party plaintiff and for lack of authority over the subject matter.

If it were necessary to decide these questions, we should be called upon to construe not only the statutory requirements in order to determine whether those lacking are jurisdictional, but also the allegations of the bill to ascertain whether they may spell out by implication sufficient to meet the statute's demands. But we do not regard it as necessary to undertake construction of the statutes or of the bill to determine whether it could be held sufficient in the jurisdictional sense for the purposes of either § 391 or § 416. There is stronger foundation for the court's jurisdiction.

In our judgment the bill was not designed as one for a statutory dissolution and relief incident thereto by way of receivership. This is shown not only by the absence of the statutory allegations and requirements concerning status of the petitioner, but also by the character of the allegations made, the prayer for relief, the circumstances under which the bill was filed, and the disposition of the case made by the court up to the final hearing and decree in this cause.[5] The record clearly shows that all parties in interest, as well as the court, regarded the company's condition as extremely serious, but with some reason entertained the hope until long after filing of the bill that it might be rehabilitated by the shareholders or the policyholders and a dissolution avoided. That this case was not docketed for trial until years after the normal time for doing so had passed indicates that those who now challenge the Pinkett proceeding's validity shared this hope.[6] Although the bill contained a general allegation of "insolvency" and a prayer for "dissolution" as alternative to other relief, each term is ambiguous[7] and must be construed in relation to the bill as a whole. The answer did not specifically admit the "insolvency" or join in the prayer for "dissolution." Other allegations, in both bill and answer, combine with the alternative form of the prayer and the circumstances in which the bill was filed, to show that there was no intention to commit the corporation (or the court) to the single and extreme "remedy" provided by the statute.[8] Nearly the only certainties were that no one knew or could know the company's actual financial condition, whether it was solvent or insolvent in the strict sense or merely unable to pay obligations as they matured; and that pending and threatened legal and administrative proceedings made continued normal operation impossible and, if unchecked, rendered certain destruction of the business and dissipation of the assets. With relief from the massing of attacks on many legal fronts, there was a chance that

third or more of the stock, or upon authorization of a majority of the shareholders (§ 391).

[4] It did not allege that the district attorney had declined to bring the suit or that the corporation's insolvency or inability to pay its debts or suspension of normal operations had continued for one year (§ 416). The required inventory and account of assets, debts, capital stock, etc. (§ 392), was not annexed to the petition. The prayer for dissolution was alternative to other and obviously more desired relief, although the statute appears to contemplate no alternative, and no explicit consent to dissolution was made in the answer. Many of the allegations, both of the bill and of the answer, are inconsistent with the idea that a statutory, or any, dissolution was desired, save as the last resort on failure of all other relief.

[5] Cf. notes 2, 3, 4, supra.

[6] The Pinkett case had been pending almost two years when this suit was begun. Although answers herein were filed November 15, 1933, the cause was not calendared for trial until February 20, 1935, nor did it come on for hearing until December 10, 1937.

[7] Cf. note 1, supra. The action of the court, as well as the language of its order deferring a decree for "dissolution," shows that it construed the allegation of insolvency to mean, not an excess of liabilities over assets in the strict sense, but merely inability to pay obligations as they matured and to carry on business in the normal way. Its refusal to find that shareholders might not receive some dividend shows that the meaning accepted was impairment of capital, not technical insolvency. It follows that the "dissolution" contemplated as the ultimate, but possibly avoidable, "relief" was liquidation, not technical ending of the corporate entity. This is reinforced by the later ruling in this cause that technical dissolution could be had in a statutory proceeding, the court retaining jurisdiction for purposes of liquidation in the equity case.

[8] Cf. note 4, supra.

the business could be saved; if not, then reorganized to salvage something for policyholders; or, finally, these alternatives failing, that assets could be preserved in larger volume for liquidation. The bill and answer were framed in view of these alternatives and the uncertainties of fact which made them possible. Any other course would have deprived shareholders, policyholders and creditors of chances worth taking, to say the least, in advance of known or demonstrable necessity for foreclosing them. Hindsight now may indicate that the chances should not have been taken. But the situation is to be judged, not through the rear-vision mirror, but prospectively as of the time when and the conditions in which the bill was filed. In view of these considerations, we think the bill was intended to invoke the court's general equity jurisdiction, not its statutory power. The latter offered only one, and that a fatal, end. The former gave leeway to ascertain the facts and adapt the final relief to them as proven. The one was consistent, the other inconsistent, with some of the objects of the bill. These were, first, to preserve the assets and, if possible, the business from imminent dissipation and destruction by multiplicious litigation; second, to ascertain the company's true financial condition; and, finally, to secure ultimate relief, either by liquidation and distribution or otherwise as the facts and equities of the case, when ascertained, should disclose to be proper.

■ The question remains whether the

bill was sufficient to invoke the court's general equity jurisdiction. We think it was, certainly to the extent that the court's action cannot be questioned by collateral attack, as is attempted here; possibly even to a more conclusive effect.

First, none of the District statutes can be regarded as excluding this jurisdiction. They do not purport to cover receiverships generally, as do some in the states.[9] They are dissolution statutes, not receivership acts. They have no purpose of revival or salvation, nor do they purport to allow leeway for alternative relief or molding the final remedy to varying states of fact. Their object is corporate death, not resurrection. The authority they confer for creating receiverships is incidental only to a technical termination of the corporate entity when its objects have been fulfilled or have become unattainable. The methods provided may be exclusive of others for technical dissolution of the corporate being.[10] This, however, is to be distinguished from "dissolution" in the sense merely of liquidating the corporation's business.[11] The exclusion, if it exists, does not oust the court from its general, sometimes called "inherent," equity jurisdiction to establish receiverships in proper circumstances.[12] If effective to do this, these acts which exist in every state as parts of the general corporation laws and apply to the vast majority of corporations would nullify a jurisdiction widely and consistently exercised by state and federal courts.[13]

■ It is contended, however, that the

[9] Cf. the California statute (Code Civ. Proc. § 564, subds. 5 & 7) and similar acts cited 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7709, particularly notes 38–42, 45–47; § 7711; McDougal v. Huntingdon & Broad Top Mountain Railroad & Coal Co., 1928, 294 Pa. 108, 114–116, 143 A. 574, 577. The California act enumerates specific grounds and "all other cases where receivers have heretofore been appointed by the usages of courts of equity." Acts even so broad are said to be in recognition, not in limitation, of general equity jurisdiction. 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7709, note 40.

The District statutes are not designed specifically for insurance companies, nor is there any provision for administrative receiverships, as is true in some states. Cf. State ex rel. Missouri State Life Ins. Co. v. Hall, 1932, 330 Mo. 1107, 52 S. W.2d 174; Pennsylvania v. Williams, 1935, 294 U.S. 176, 55 S.Ct. 380, 79 L. Ed. 841, 96 A.L.R. 1166; Penn General

Casualty Co. v. Pennsylvania, 1935, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850; note 11, infra; 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7673, note 35.

[10] Cf. 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7977, and authorities cited note 88.

[11] Id., §§ 7672, 7967, 8002, note 13; United States Elec. Lighting Co. v. Leiter, 1887, 8 Mackey, 19 D.C. 575; Petrogradsky, etc., Bank v. National City Bank, 1930, 253 N.Y. 23, 170 N.E. 479; Scholl v. Allen, 1931, 237 Ky. 716, 36 S.W.2d 353.

[12] That this is true in the District of Columbia is implicit in Masters v. Hartmann, 1916, 45 App.D.C. 253. It has been asserted to be beyond legislative power to deprive the courts entirely of such jurisdiction. Smith v. Washington Casualty Co., Ch. 1932, 110 N.J.Eq. 122, 159 A. 510, 517; cf. the decisions of the Supreme Court cited infra note 13.

[13] Cf. authorities cited infra, passim.

sole object of the bill (eliminating "dissolution") was a receivership, and, in line with ancient formula, that equity has no general jurisdiction, apart from statute, to appoint receivers except in a "suit pending" for other and "independent" or "ultimate" equitable relief. The court accepted these views both of the bill and of its authority.[14]

In our judgment the court erred in construing the bill. For reasons previously stated, we think the "dissolution" intended by the prayer was a liquidation of assets, not a technical destruction of the corporate entity. The distinction has been made repeatedly in receivership proceedings.[15] It was disregarded in the court's ruling, apparently in reliance upon the peculiar and vigorously criticized[16] doctrine of a few jurisdictions. The language of the prayer might have been made more elaborate and specific, as by substituting or adding some such phrase as "marshalling assets and determining liens and claims" or "liquidation of assets and distribution," etc. This merely would have expressed more lengthily meaning which the prayer sufficiently, though briefly, conveys in its present form. There was therefore a sufficient prayer for specific equitable relief. That it was stated as alternative to other relief which the court might find more appropriate does not vitiate it. To hold otherwise would deprive a court of equity of its adaptability, which is the essence of its process, and compel it to do inequity by liquidating the business when the facts might disclose no occasion whatever for doing so. There was also a prayer for general relief, but we need not determine whether that, coupled only with one for receivership, would meet the rule's requirements. Finally, it seems clear that the allegations, rather than the prayer, determine whether the sole object of the suit is a receivership.[17] They show clearly here that liquidation and distribution were contemplated as the final relief, if better could not be had. In this view of the bill, it is not necessary for us to determine whether one asking no other relief than a receivership in similar circumstances would be defective.[18]

■■ The same result is dictated by another reason. The objection that no other relief is sought must be made in the proceeding challenged, not collaterally as here. It does not go to the basic power of the court. At most it affects the propriety of its action or the existence of "equity" in the

The existence of an apparently exclusive administrative jurisdiction over liquidation does not oust federal receivership jurisdiction, though it may negative the propriety of its exercise. Pennsylvania v. Williams, 1935, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166, and Penn General Casualty Co. v. Pennsylvania, 1935, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850.

14 In accepting this conception of its power, it was influenced to some extent as is apparent from its opinion, by the view that the equity jurisdiction of the federal district courts is more narrowly restricted than that of state courts of general jurisdiction and that its own jurisdiction is no more extensive than that of federal district courts sitting in the states. The former premise, we think, confuses the scope of federal equity power with the conditions of federal jurisdiction which bring it into play. Prior to Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, at least, there was room for the view that the federal equity power over receiverships was in some respects broader than that exercised by some of the state courts. Cf. Pennsylvania v. Williams, 1935, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166. But whether this be so need not be determined for two reasons: (1) the equity jurisdiction of the court below over "local" matters arising in the District of Columbia is not conditioned upon the existence of the requisites of distinctively federal jurisdiction—as to such matters its jurisdiction is more nearly analogous to that of a state court of general jurisdiction; (2) if it were so conditioned, that jurisdiction, when established, clearly includes granting a receivership in the circumstances of the Pinkett case. Cf. notes 18–20, infra.

15 Cf. note 11, supra. The distinction is always implicit when the receivership involves a foreign corporation [e. g., Scholl v. Allen, 1931, 237 Ky. 716, 36 S.W.2d 353] or a state corporation when the suit is in a federal court.

16 Cf. 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7672.

17 Id., § 7683, note 23.

18 Cf. id., §§ 7683, 7684; Scholl v. Allen, 1931, 237 Ky. 716, 36 S.W.2d 353; Scattergood v. American Pipe & Construction Co., D.C.,E.D.Pa.,1917, 247 F. 712; McDougal v. Huntingdon, 1928, 294 Pa. 108, 143 A. 574; Taylor Finance Corp. v. Oregon Logging & Timber Co., 1925, 116 Or. 440, 241 P. 388; (1921) 35 Harv.L.Rev. 204; (1930) 43 id. 1298, 1301; Glenn, Liquidation (1935) § 172; and authorities cited infra note 20.

bill. That this is true appears clearly from Gordon v. Washington, 1935, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282.[19] In that case the objection was held specifically to be one "addressed to the propriety of its action as a court of equity," not to the court's jurisdiction in the fundamental sense. The opinion expressly states: "The relief prayed was that which a court of equity is competent to give. The bills of complaint were therefore sufficient to invoke the power and authority conferred on the District Court by the Constitution and statutes of the United States * * *." (295 U.S. page 35, 55 S.Ct. page 587, 79 L.Ed. 1282). In this respect the opinion is entirely consistent with other decisions of the same court, by clear implication if not in explicit terms.[20] A court is said to have jurisdiction in the sense that its erroneous action, if any, is voidable only and not void, when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the complaint is not obviously frivolous. See Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 305, 306, 44 S.Ct. 96, 68 L.Ed. 308; Cooper v. Reynolds, 1870, 77 U.S. 308, 10 Wall. 308, 316, 19 L.

Ed. 931; Brougham v. Oceanic Steam Navigation Co., 2 Cir., 1913, 205 F. 857, 859. In the Pinkett case the parties were before the court, the cause was one in equity and therefore one within a class which the court had power to adjudicate, and the claim set forth was not obviously a frivolous one. Therefore the present collateral attack must fail.

Apart from the sufficiency of the prayer, it is not and could not well be contended that the court was lacking in jurisdiction of the cause or, if that were material here, that the bill was "lacking in equity." The condition of the company was extreme. The times were rough. The old management had resigned under fire. No one knew or could know the company's actual financial condition. Legal attacks abounded. The company involved a special public interest.[21] Policyholders, standing between shareholders and general creditors with matured or short-term claims, were peculiarly helpless. Normal operation might have been criminal. The statutory "remedies" (§§ 391 and 416) were inappropriate and inadequate. The company gave "friendly," but not "collusive," because honest, consent.[22] No one questioned this

---

[19] See particularly 295 U.S. pages 36–38, 55 S.Ct. 584, 19 L.Ed. 1282. Other reasons also supporting the decision were: The plaintiffs in the receivership suit were not creditors or shareholders of the corporation; there was no showing of danger to the assets in which they were interested (funds alleged to be held in trust) or to their management which would be averted by appointment of receivers; nor were these defects waived or consent given to the appointment (295 U.S. 39, 55 S.Ct. 584, 79 L.Ed. 1282). Furthermore, the assets were in the hands of a statutory administrative receiver.

[20] Cf. Brown Bonnell & Co. v. Lake Superior Iron Co., 1890, 134 U.S. 530, 10 S.Ct. 604, 33 L.Ed. 1021; Re Metropolitan Railway Receivership, 1908, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403; Pusey & Jones Co. v. Hanssen, 1923, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; United States v. Butterworth Corp., 1926, 269 U.S. 504, 46 S.Ct. 179, 70 L.Ed. 380; Harkin v. Brundage, 1928, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457; Burnrite Coal Co. v. Riggs, 1927, 274 U.S. 209, 47 S.Ct. 578, 71 L.Ed. 1002; Shapiro v. Wilgus, 1932, 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128; Michigan v. Michigan Trust Co., 1932, 286 U.S. 334, 52 S.Ct. 512, 76 L.

Ed. 1136; Pennsylvania v. Williams, 1935, 294 U.S. 176, 181, 182, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166; Penn General Casualty Co. v. Pennsylvania, 1935, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850. See also Luhrig Collieries Co. v. Interstate Coal & Dock Co., D.C. S.D.N.Y.1922, 281 F. 265; Jones v. Pearl Mining Co., 1894, 20 Colo. 417, 38 P. 700; Union State Bank v. Mueller, 1918, 68 Okl. 152, 172 P. 650; Holland v. Silver Basin Min. Co., 1920, 113 Wash. 63, 193 P. 500; Haywood v. Lincoln Lumber Co., 1885, 64 Wis. 639, 26 N.W. 184.

[21] The existence of such an interest often is assigned, and rightly, as reinforcing reason for creating a conservation receivership. McDougal v. Huntingdon, etc., Co., 1928, 294 Pa. 108, 143 A. 574; cf. Shapiro v. Wilgus, 1932, 287 U.S. 348, 356, 53 S.Ct. 142, 77 L.Ed. 355, 85 A.L.R. 128; First Nat. Bank v. Flershem, 1934, 290 U.S. 504, 515 note 7, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391. Appearing frequently in railroad cases, it is peculiarly applicable also to financial institutions, building and loan corporations and insurance companies.

[22] That "friendly" consent had not degenerated into "collusion" is shown not only by the pendency and threats of mul-

or the proceeding's validity, although intervention was available to all having grounds for objection. In these circumstances the substantive allegations of the bill were not "wanting in equity."

■ Nor was the bill lacking in a proper complainant, whether considered as a shareholders' or a creditors' bill. Pinkett was a substantial shareholder and "paid up" policyholder.[23] He sued also as attorney-in-fact for many other policyholders. Whether or not this made the bill technically a class bill,[24] he and those he represented had interests commonly protected in this manner.[25] If the amended petition was defective originally as a creditors' bill, the defect was cured by the corporation's consent[26] and the failure of others to object. As a shareholder's bill it was lacking in no required element.

Plaintiffs have suggested, but have not argued seriously that the court lost jurisdiction in the Pinkett case through its al-

legedly improper orders. That issue was not raised below except by innuendo and no authority is cited to sustain the position here.

■ II. It is argued that the Shaw-Walker receivership supersedes the Pinkett one, even though the latter be regarded as originally valid. This is done apparently on two theories: (1) that the statutory provision for appointment of receivers is mandatory or (2), if not so, that it vests in the court a discretion which when exercised by such an appointment somehow rises above and displaces any previously existing equity receivership.

We do not regard the statutory provision (§ 417) as mandatory. It is not so in terms. The language is permissive. We think it was made so designedly. The technical dissolution provided for by § 416 might or might not require an incidental receivership for liquidation of assets. That might be accomplished in other ways prior to filing

---

tiplicious litigation and revocation of licenses, the recent ouster of officers and election of new ones, but also by the acquiescence, even encouragement by public insurance officials of the procedure followed, the absence of intervention to contest the Pinkett proceeding, and the absence of allegation in this one that collusion existed.

[23] He also held other policies. That a policyholder becomes a creditor, at least upon adjudication of insolvency, is well settled. Carr v. Hamilton, 1889, 129 U. S. 252, 9 S.Ct. 295, 32 L.Ed. 669; 1937, 106 A.L.R. 1513; cf. Burnet v. Wells, 1933, 289 U.S. 670, 53 S.Ct. 761, 77 L.Ed. 1439; Pierce v. Equitable Life Assurance Society, 1887, 145 Mass. 56, 12 N.E. 858, 1 Am.St.Rep. 433. And it has been held that where the insurance company is in fact insolvent, though not so adjudicated, policyholders have the same rights as general creditors to obtain a receiver in order to protect their interests. Robinson v. Mutual Reserve Life Ins. Co., C.C.S.D.N.Y.1908, 162 F. 794; Commonwealth v. Richardson, 1906, 94 S.W. 639, 29 Ky.Law Rep. 622. The policyholder's peculiar position would seem to make him even more appropriately a subject of equity's concern than a shareholder or a general creditor in the usual sense. His interest in the assets is superior, for purposes of distribution at least, to the shareholder's, and equal to that of the general creditor, though the maturity of his claim always is more uncertain and generally much longer deferred. He, if anyone, has "no adequate

legal remedy," when the company's legal reserves are impaired or threatened as they were here. Dissolution often means that forced liquidation leaves him little, if anything, after prior creditors are paid.

[24] Even though the usual allegation that suit is instituted on behalf of all others similarly interested was lacking, the liberal provisions of the District Court rules for intervention [Rules of the Supreme Court for the District of Columbia (1931) Rule 66; Federal Rules of Civil Procedure (1938) Rule 24, 28 U.S.C.A. following section 723c] make the absence of the allegation a merely technical deficiency, if indeed the defect is not waived by failure to make timely objection. The suit may be solely in protection of the shareholder's interest, though it may be instituted also on behalf of a class.

[25] Cf. authorities cited supra, notes 18 and 20.

[26] That the objection goes to failure to exhaust legal remedies, not to deficiency in jurisdiction over the subject matter, see Note (1930) 43 Harv.L.Rev. 1298, note 2; L. Hand, J., in Luhrig Collieries Co. v. Interstate Coal & Dock Co., D.C. S.D.N.Y.1922, 281 F. 265, 268, 269; Metropolitan Railway Receivership, 1908, 208 U.S. 90, 109, 28 S.Ct. 219, 52 L.Ed. 403.

Any question concerning the authority of the president to answer on behalf of the corporation has been removed long since by the directors' acquiescence in his action and in the receivership, both by failure to object and by submission to the receivers' control of the business.

of the petition for dissolution or there might be no assets to distribute. In such circumstances a receivership would be superfluous. In others it would be a waste, as when liquidation is in process in other courts or proceedings, particularly when it is substantially complete. We think the statute permissive in purpose as well as in language. The appointment is in the court's discretion as is the injunctive relief provided by the same section.

 Normally the exercise of the trial court's discretion will not be disturbed on appeal. But it is judicial, not arbitrary. It becomes arbitrary if exercised for an erroneous reason.[27] Here the principal reason assigned by the court, and undoubtedly the controlling influence, in displacing the Pinkett receivers with the Shaw-Walker ones, was the alleged want of jurisdiction in the Pinkett case. That reason failing, the action based upon it also falls, unless sustained by other grounds. No other grounds were assigned, except as they may have been implicit in the citation of Michel v. William Necker, Inc., Ch.1919, 90 N.J. Eq. 171, 106 A. 449, which we do not regard as sufficient to support the court's action.[28] Much was said at the hearing and in the record concerning alleged misconduct of the Pinkett receivers and impropriety of court orders directing or approving their actions. But the court expressly disclaimed any intention to pass upon these charges and neither found that such misconduct had occurred nor based its decision upon any such ground. Ordinarily questions concerning propriety of receivers' actions should be raised in the receivership proceeding, not by collateral attack. If any particular action approved by the court is claimed to be entirely in excess of its jurisdiction, apart from a broadside attack upon the court's jurisdiction of the receivership proceeding, the question should be raised either in the proceeding or in a suit appropriately designed for that purpose.[28a]

We think also that there were valid and controlling reasons which dictated that new receivers not be appointed in the Shaw-Walker case. These are found in the analogies to be drawn from cases involving competition between different courts for control over property involved in receivership proceedings[29] and in the facts concerning the status of the Pinkett proceeding, putting aside the jurisdictional question. Especially pertinent is the language quoted below from Kessler v. William Necker, Inc., D.C.N.J.1919, 258 F. 654, which involved a situation much like that presented here.[30] Whatever may be said for promot-

[27] Cf. Cissell v. Cissell, 1932, 61 App. D.C. 271, 61 F.2d 679; Pedersen v. Pedersen, 71 App.D.C. 26, 107 F.2d 227 (decided August 14, 1939).

[28] Cf. note 30, infra.

[28a] Cf. Platt v. New York & S. B. Ry., 1902, 170 N.Y. 451, 63 N.E. 532; Seagraves v. Green, 1926, 116 Tex. 220, 288 S.W. 417; Carter v. Mitchell, 1932, 225 Ala. 287, 142 So. 514; Gutterson & Gould v. Lebanon Iron & Steel Co., C.C.M.D.Pa.1907, 151 F. 72; Birmingham Trust & Savings Co. v. Atlanta, B. & A. Ry., D.C.N.D.Ga.1921, 271 F. 731.

[29] Cf. Harkin v. Brundage, 1928, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457; Pennsylvania v. Williams, 1935, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166; and Penn General Casualty Co. v. Pennsylvania, 1935, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850; Wabash R. R. v. Adelbert College, 1908, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; Railroad Credit Corp. v. Fruit Growers' Express, 1934, 63 App.D.C. 208, 71 F. 2d 218. Both priority in taking possession of the property and the stage of advancement of liquidation are material considerations, particularly where they combine in favor of one of the contending courts. Cf. Kessler v. William Necker, Inc., D.C.N.J.1919, 258 F. 654; Notes (1927) 40 Harv.L.Rev. 70, (1933) 42 Yale L.J. 1122.

[30] "Since September 30, 1916, the complainants in chancery have consented to, or stood by and watched, the conduct of this business by the receiver of this court, and now, when it is about to be closed up, they come forward and, not denying that the business should be wound up and the property disposed of, say the job should be given to them or their receiver, and the property in the possession of the federal receiver turned over to the chancery receiver. It is difficult for me to understand their motive, for everything that the receiver has done toward winding up the business must be done again by the chancery receiver, if the property of the corporation is turned over to him, all to no purpose, and at the expense of the creditors. Neither on legal principle nor economic policy can I conceive a good reason why this should be done, and under the facts of this case my duty to the creditors demands that I direct the receiver of this court to continue to wind

ing harmonious relations between federal and state courts by relinquishing to either property otherwise within the jurisdiction of the other, there is certainly no principle of comity which requires a court to surrender its previously acquired control to another coordinate one of the same jurisdiction[31] or, as here, one judge to substitute his discretion for that of others of the same court previously exercised.[32] In the present case no valid reason appears for adding another receivership to one which plaintiffs claim already has existed too long. The purposes of the two now are identical. The assets have been liquidated and only distribution remains to be made. That can be done by the court below as well under its equity powers[33] as under its statutory authority, with probably less expense. If there is serious question as to any action of the Pinkett receivers, objection can be made in the Pinkett proceeding. If for any reason, including a sufficient showing of misconduct, the court should find it desirable to change receivers, it will be free to do so in the exercise of its judicial discretion. But we think that discretion should be exercised, if at all, in the Pinkett proceeding and not indirectly by creating another receivership in this case.

■ III. What we have said makes it unnecessary to pass upon other questions presented by the record and by various motions which have been filed upon appeal. Most of them raise the basic jurisdictional question in some variant form.[34]

---

up the business of the said company, in accordance with the order heretofore made." 258 F. 661-662.

The court below, disregarding this opinion, relied upon a decision of the state court in effect holding New Jersey's statutory procedure for dissolution to be exclusive of all other methods of liquidation (cf. text, supra, note 28). The state court relied largely on Hitchcock v. American Pipe and Construction Co., Ch.1918, 89 N.J.Eq. 440, 105 A. 655, reversed 1919, 90 N.J.Eq. 576, 107 A. 267, and directed the receiver to file a petition in the federal court for relinquishment of the property. The federal court denied the petition, not only implicitly because of its distinctively federal jurisdiction, but more largely and explicitly because of the impropriety of creating another receivership under the circumstances. No appeal appears to have been taken.

31 Cf. 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7674; Alderson, Receivers (1905) § 22; Northwestern Iron Co. v. Land & River Improvement Co., 1896, 92 Wis. 487, 66 N.W. 515. "Courts of co-ordinate jurisdiction * * * must not attempt to overrule the decisions of each other, except for the most cogent [jurisdictional?] reasons." Continental Baking Co. v. Woodring, D.C.Kan.1931, 55 F. 2d 347, 350; cf. Sanborn, J., in Plattner Implement Co. v. International Harvester Co., 8 Cir., 1904, 133 F. 376, 378.

32 16 Fletcher, Cyc. Corp. (Perm. ed.) § 7674, notes 43, 44, citing authorities including Hardy v. North Butte Mining Co., 9 Cir., 1927, 22 F.2d 62, which reviews many cases. Cf. Johnson v. Manhattan Ry., 1933, 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331, sustaining a much more questionable prior exercise of jurisdiction than was involved here, but commenting admonitorily upon its propriety.

It is not necessary to determine how far, if at all, a judge may be bound by prior rulings of his colleagues of the same bench upon questions of the court's jurisdiction. Even if collateral attack be permissible on such an issue, it is not allowed when the question is one of discretion only. Cf. Humphrey v. Bankers Mortgage Co., 10 Cir., 1935, 79 F.2d 345, 352; Scranton Button Co. v. Neonlite Corp., Ch.1930, 105 N.J.Eq. 708, 149 A. 369.

33 Cf. Michigan v. Michigan Trust Co., 1932, 286 U.S. 334, 344, 345, 52 S.Ct. 512, 76 L.Ed. 1136. Section 417 makes no provision concerning methods or procedures to be followed by the statutory receiver in administration and dissolution. These are left to the general discretion of the court.

34 In addition to those noted in the text supra, motions have been filed to strike the names of the insurance company and the Pinkett receivers as appellants; for dismissal of the appeal; for modification of the order allowing it; to strike the names of counsel for the appellants as attorneys for the insurance company and for the Pinkett receivers as purporting to act for it; and for orders requiring them to show their authority to appear as such attorneys. It does not add to the persuasiveness of the motions that some of them are filed in the name of the insurance company, purportedly acting by John T. Risher, as its president, who also, on behalf of the company, signed and verified the answer in the Pinkett case.

We need not decide the question, raised only by the answer, whether service in the Shaw-Walker case upon the insurance company by delivering process to the president, Risher, was adequate in view of the injunction against interference by

It is argued also that the Pinkett receivers may not prosecute this appeal because, it is said, they have not shown that they obtained leave of the appointing court. The order appointing the Pinkett receivers gave them exclusive power to manage the corporation's affairs and enjoined all others from interfering with them. This covered the conduct of litigation not only by clear implication from the terms of the order and the circumstances in which it was made, including the pendency of numerous legal proceedings, but also by the specific provision contained in the order authorizing them to employ and discharge counsel and fix their compensation.[35] The contention therefore merely presents in another form the validity of the decree rendered herein. If valid, its effect would be to terminate the Pinkett receivers' authority. Being invalid, it cannot do so.

IV. What has been said disposes of the present appeal. It is to be understood as limited specifically and solely to the two issues we have decided, namely, that the court had jurisdiction in the Pinkett case and that its discretion was exercised arbitrarily in appointing receivers in the instant case and holding that the receivership in the latter supersedes the receivership in the former. In so ruling we wish it to be clearly understood that we express no approval of the manner in which the Pinkett receivership has been conducted. As has been said, the record is replete with charges of misconduct against the Pinkett receivers as

well as with assertions that the trial court repeatedly exceeded its jurisdiction in making particular orders in the course of the administration. Criticism has been directed especially toward its actions in permitting the receivers to carry on the "modified" business and to make payments on matured policy claims while it was being conducted, in making allowances of fees to the receivers and their counsel, and in other respects. For reasons already stated, we make no decision concerning these matters. However, we cannot ignore entirely the fact that the record shows, through the temporary receiver's initial report, that the company's net worth was $2,396,749.29 when the Pinkett receivership was beginning and that now it is charged the assets have shrunk to less than $100,000, apparently without a liquidating dividend. Abnormal as the times have been recently, such a shrinkage, if it exists, gives cause for scrutiny. It may have been due to causes over which neither the receivers nor the court had or could have had control. Whatever the facts may be, the court should scrutinize the final report of the receivers with great care. Extended already too long, nevertheless in view of the uncertainties and possibilities the proceeding should not be closed until the court has made certain, either upon appropriate objection or on its own motion, if that should be necessary, that its officers, the receivers, have discharged their full duty to the court and to those whose interests it has in charge. That determina-

---

the officers in corporate affairs [cf. United States v. Whitridge, 1913, 231 U.S. 144, 34 S.Ct. 24, 58 L.Ed. 159, with Gaboury v. Central Vt. Ry., 1929, 250 N.Y. 233, 165 N.E. 275; cf. also J. B. Beaird Corp. v. Johnson, La.App., 1934, 152 So. 789], since the Pinkett receivers appeared and answered, thus submitting to the court's jurisdiction. Orinoco Co. v. Orinoco Iron Co., 1924, 54 App.D. C. 218, 296 F. 965, affirmed 1924, 266 U. S. 121, 45 S.Ct. 53, 69 L.Ed. 199.

[35] It is the general rule that a receiver must obtain leave of the appointing court in order to sue or defend, or to take an appeal. 1 Clark, Receivers (2d ed. 1929) 825 ff. However, this does not necessarily require specific consent in every case. And it has been held that the receiver is presumed to have obtained leave in the absence of evidence in the record to the contrary. Manker v. Phœnix Loan Ass'n, 1904, 124 Iowa 341, 100 N.W. 38; Reed v. St. Louis & S. F. R. R., 1919,

277 Mo. 79, 209 S.W. 892. On the other hand, it seems to be the rule that one suing a receiver must obtain leave of court. Barton v. Barbour, 1881, 104 U. S. 126, 26 L.Ed. 672. Cf. 28 U.S.C. (1934) § 125, 28 U.S.C.A. § 125, removing this requirement as to suits arising out of the receiver's own acts. However, the right to contest the court's jurisdiction on this ground may be waived by the receiver's voluntary appearance. Reed v. St. Louis & S. F. R. R., supra; Elkhart Car-Works Co. v. Ellis, 1888, 113 Ind. 215, 15 N.E. 249.

The order of the court appointing the permanent receivers not only gave them full authority "to carry on the business and to administer the affairs," except writing new insurance, but also enjoined all others, including officers, shareholders, etc., from interfering with them and gave them specific authority "to employ and/or discharge such counsel * * * and fix their compensation," etc.

tion having been made expeditiously but thoroughly, the case should be closed with dispatch.

In our judgment much of the delay and confusion which has characterized the judicial administration of this company's affairs may be attributed to the haphazard system which has prevailed in the trial court for handling receivership matters. It may not be possible in all instances for a single judge to handle a particular receivership in its entirety. But it should not be impossible for the court to bring about this result as its normal mode of operation in such cases. A receivership differs from ordinary litigation in that years usually are required to complete the trial court's phase of the work. Not one or a few, but many, orders are required. Knowledge of what has been done previously is as essential to efficient supervision as it is to the performance of the receiver's task. An "informed, independent judgment" concerning "every important determination" is as necessary for the court as for its officer.[36] Recent criticism, lay and professional, of judicial conduct of receivership matters, makes it of primary importance that courts take advantage of all means available to eliminate any basis for it which may exist in fact, even though that

may involve some departure from the normal routine of judicial labor or from the personal preferences of judges concerning the organization of their work.[37] Assignment of the entire cause to a single judge would conserve energy otherwise wasted in informing successively unfamiliar judges concerning the case and avoid the possibility of conflict among colleagues of the bench as well as confusion to counsel and expense to the parties, as this case aptly shows.

At best it may be that the remedy of receivership is worse than the diseases it is applied to cure. Perhaps it is unfortunate that Congress has not provided for administrative insurance receiverships under the local Commissioner of Insurance similar to those which have been authorized for insurance companies in many of the states. However, until some other provision is made, it is the duty of the courts to exercise the jurisdiction which Congress has conferred upon them in such manner that abuses may be prevented or eliminated when they are discovered.

The decree is reversed and the cause remanded to the trial court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

---

[36] National Surety. Co. v. Coriell, 1933, 289 U.S. 426, 436, 53 S.Ct. 678, 682, 77 L.Ed. 1300, 88 A.L.R. 1231; see also 289 U.S. page 435, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231.

[37] Cf. National Surety Co. v. Coriell, 1933, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231; Johnson v. Manhattan Ry., 1933, 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331. The "recession" from Metropolitan Railway Receivership (Matter of Reisenberg), 1908, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403,

made in Harkin v. Brundage, 1928, 276 U.S. 36, 48 S.Ct. 268, 72 L.Ed. 457, and other cases, cf. Frankfurter & Hart, The Business of the Supreme Court at October Term, 1932 (1933) 47 Harv.L.Rev. 245, 291, note 115, is from too facile exercise of the jurisdiction to create receiverships, not from its existence. National Surety Co. v. Coriell, supra. But it must be recognized that the recession has been brought about by the fact that abuses have been permitted.